State *v.* Warner.

B. R. G. Warner *v.* The State.

1. Criminal Law. *Witnesses before the grand jury. Contempt.* The attorney-general during the term of the court, has no authority to order the clerk to issue a subpœna for a witness to appear before the grand jury to testify as to gaming. If a witness appear under such subpœna and refuse to answer, he is not guilty of contempt.

2. Same. *Same. Same.* A witness properly subpœnaed before the grand jury to testify in regard to gaming, who refuses to answer touching his knowledge of gaming, although his answer may show his own guilt, is guilty of contempt for which he may be fined and imprisoned.

3. Same. *Contempt.* A judgment of imprisonment for contempt is subject to revision by the Supreme Court brought up by writ of *certiorari.*

FROM SHELBY.

Appeal in error from the Criminal Court of Shelby county. J. M. Greer, J.

T. W. Brown for Warner.

Attorney-General Lea for the State.

Turney, J., delivered the following opinion.

The grand jury for Shelby county being organized and in session, the attorney-general, upon his own motion, ordered to be issued a subpœna for the plaintiff in error "to appear before the grand jury to testify and give evidence on behalf of the State concerning his knowledge relative to a bill of *indictment to be preferred* against divers persons for the offense of gaming committed within the said county of Shelby," etc.

State *v.* Warner.

It was admitted by the attorney-general that the subpœna was issued by his instructions and not at the instance of the grand jury, and that said Warner was not sent before the grand jury upon any indictment against any individual. Warner was interrogated by the attorney-general and the grand jury "as to whether he knew of any unlawful gaming in the Gayoso Club rooms over his saloon." Refusing to answer, the foreman accompanied him to the presence of the court. The court inquired of the prisoner "upon what ground he based his refusal." He replied that he was president of the Gayoso Club, that there were some sixty members of said club, and that he did not desire to speak of any thing pertaining to the club. That his answer might criminate himself, and therefore he had refused to answer. The court instructed him "that a person was not liable to prosecution for any information given before the grand jury touching any misdemeanor in which he might have taken part, hence he could not criminate himself even if he answered that he had been engaged in said gaming, and that he could not be prosecuted." He still refused to answer and was committed for contempt of court. The case is before us upon a *supersedeas* of the order of committal.

The first question is, was the plaintiff in error before the grand jury as the law contemplates so as to subject him to punishment for a refusal to answer questions? The acts of 1824 and of 1829, carried to Code by sec. 5087, provides: "The grand jury shall send for witnesses whenever they or any of them sus-

pect a violation of the laws against gaming," etc. Here it is not pretended that the grand jury sent for the witness. On the contrary that idea is distinctly and in terms negatived by the record as we have seen. He goes before it without any intimation from it that it or any one of its members suspected a violation of the law against gaming. The power to send for witnesses is conferred alone upon the grand jury. The law conferring such power is in derogation of common law, and must be strictly construed.

Then by what authority does an attorney-general assume to perform the functions and exclusive duties of the grand jury? The mere fact that he is an officer of the court and may visit the grand jury, prepare and present indictments to them, and prepare presentments when directed by the grand jury, does not imply an authority to assume any of the duties assigned by law to a grand juror. If he may assume the office of grand juror for one purpose, why may he not do so for every purpose? If because he suspects a violation of law, he may of himself and of his own motion order a subpœna for witnesses to go before the grand jury to give evidence touching the same, why may not the sheriff or constable who waits upon the grand jury do so? Why may not the judge himself or any attorney for the court assume and practice the power?

It requires a judge, attorney-general, attorneys, clerks, sheriffs, etc., to constitute a court, and each is an officer of the court, so if we construe the law directed to grand juries to include one officer of the

court, we must for the same reason construe it to embrace all officers of that court.

The attorney-general might, as could any other ·citizen, have communicated his suspicions of a violation of law to the grand jury and induced it to send for witnesses, but because he might have exerted an influence to persuade the jury to exercise its inquisitorial power, it does not follow that he is authorized to employ that power also. Any citizen has the right to suggest or make known to the grand jury that the law is being violated, and upon such suggestion or information, the grand jury may, and perhaps under the statute it would be its duty to, send for witnesses, yet the citizen has no right to have witnesses sent for (upon his bare order to the clerk), to be interrogated by the grand jury upon matters of his suspicion or even knowledge.

That the Legislature did not intend to confer upon attorneys-general the power to order process of subpoena, in the sort of case before us, is manifest from section $5090\,a$, by which he is empowered to call upon clerks between terms for process to secure the attendance of witnesses before the grand jury at the succeeding term when, in his opinion, it is necessary to secure the ends of justice and protect the interests of the State.

This provision occurs in the same chapter with sec. 5087, under the title of "Proceedings before the grand jury." The expression of this *one power* is the exclusion of the one claimed. This construction is fortified by sec. 5090, which provides: "The clerk of

the court, on application of the grand jury, shall
issue subpœnas in such cases for any witnesses the
jury may require to give evidence before them, and
such witnesses being subpœnaed and failing to attend,
will be liable and may be proceeded against as other
defaulting witnesses." This section refers directly to
see. 5089, under which it is claimed Warner may be
compelled to testify, and shows conclusively that the
grand jury alone could order the subpœna, and if it
did not no forfeiture could be had against the wit-
ness for failure to attend, and that it is the order
of the grand jury which gives life to the subpœna
and makes it a process of law. If the witness had
failed to attend and a forfeiture had been attempted,
a plea that the grand jury had not ordered the sub-
pœna would have defeated it.

There is no such connection between the attorney-
general and grand jury created by the statute, as will
by any reasonable and legitimate interpretation warrant
the conclusion that the former, who is not even per-
mitted to be present with the grand jury during its
deliberations (Code, sec. 5082), may, in any particular
whatever, in whole or in part, exercise any power
conferred by statute upon the grand jury.

It follows that Warner was not before the grand
jury and court by process of law, while he did ap-
pear in obedience to what purported to be a sub-
pœna, that subpœna was unauthorized, was a nullity,
and gave the court no jurisdiction. In *Hatfield's* case,
3 Head, 233, Judge McKinney, in construing section
5089, says: "The term 'witness' must be understood

in a legal sense and as is obvious from the context, can only be applied to a person brought before the grand jury by compulsion to testify against others." In this case that compulsion did not exist because as already stated, the subpœna was not issued by authority of law, as is evident from the entire chapter of the statute from section 5087 to and including section 5092. Under them the power and authority to order the subpœna is vested exclusively in the grand jury—issued upon any other authority is a nullity.

In *Poteete* v. *The State*, it is held, Judge Freeman delivering the opinion, that an officer armed with a capias sufficient upon its face, must at his peril, take notice of the authority by which it was issued, and if unlawfully issued he cannot justify under it: 9 Baxt., 261.

If as Judge McKinney says, and as all must agree, the term "witness" must be understood in a legal sense, and can only be applied to one brought before the grand jury by compulsion, a fatal objection to this proceeding is that the witness was not sworn to testify. It is for the failure to testify that he may be committed for contempt if at all, and he could not testify at all until sworn—until sworn to speak the truth, etc., he was not a witness in any sense subjecting him to punishment for contempt for refusing to answer questions, as one of the essential elements of compulsion. The oath, and the only one the law regards as binding the conscience of a witness, was absent. If Warner had spoken in reply to the questions, never so falsely, he would not have been guilty

of perjury or other offense punishable by law. It necessarily follows that if Warner had answered questions criminating himself and others, he would have done so voluntarily and not as one under compulsion to attend and testify, and if indicted for the offense, as to which he had furnished evidence against others, he could not have successfully pleaded a statutory pardon in bar of the prosecution against him.

Without having been lawfully summoned and sworn he might have refused to testify in any case, civil or criminal, and the court would have been powerless to compel or punish.

The State is complaining of the obstinacy of the witness, and asking his punishment, therefore must make out a case. The record fails to show the witness was either legally summoned or sworn. We cannot supply the defect by intendment; nothing is presumed against one accused of violation of the criminal law. The State must show affirmatively every fact necessary to the commission of the offense.

In the next place, was he compellable to answer even though he had been properly summoned and sworn?

We have seen that he was president of a club whose rooms were over his saloon, and as we infer, his property. If we admit that the instructions given to him by the court were correct as far as they went, that is, that he would not be liable to a prosecution for any game in which he might have taken part if he would testify, was it correct as applied to the reason for refusal given by the witness? As we have seen, Warner said he was president of the Gayoso

Club, and that he did not desire to speak of any thing pertaining to the club, that his answer might criminate himself. Of what he might criminate himself, he does not say. The reason may imply that the offense of which he might criminate himself is more serious than simple gaming. "He does not desire to speak of anything pertaining to the club, that his answer might criminate himself." Clearly the meaning intended to be conveyed was, that the testimony sought from him would, if given, involve the club of which he was the president—the chief; that if he spoke of gaming in the rooms of the club there might be developments that would involve him and the club, or him as chief of the club in prosecution for other offenses to which the fact he was called on to prove might lead. The interest indicated by his reason manifests more concern for the club than for himself. What offenses he was seeking to avoid exposing we cannot know. What the club engaged in, what sort of house it kept, whether a gambling den or other establishment .violative of law, good order and morals, we can only speculate. Certain it is, however, he was not influenced to his refusal to answer by the sole dread of the consequences of a confession to participation in a game for money, his apprehension was of the consequences to himself on account of the character, conduct and purposes of the establishment over his saloon, of which he was principal, and he thought, perhaps, that to tell of gaming, and participation therein, would lead to a discovery that would result in his punishment.

If these things were so, as we must infer from the reason given, the exposure of persons engaged in gaming there would have been a crimination of himself. The language of our Constitution is: "And shall not be compelled to give evidence against himself." Whether the evidence demanded of the witness against himself is to apply to a case already existing, or may be used in one that may thereafter arise, it is nevertheless under the ban of the Constitutional interdiction. That it may simply point out in one case how a prosecution and conviction may be had for another and different offense, does not avoid the organic provision, and the witness cannot be compelled to testify. If the witness shall criminate himself he can only protect himself by showing that he was examined before the grand jury as to the particular offense charged against him in the indictment: *Owens* v. *State*, 2 Head, 455–7. It follows that if his testimony develop other offenses than the one inquired of by the grand jury he will not be protected.

So far the case of *Hirsh* v. *The State*, 8 Baxt., 89, is not authority in the present. In that case there was no irregularity. I think the holding in that case is not sustainable upon reason or authority.

Section 5089 of Code provides: "And no witness shall be indicted for any offense in relation to which he has testified before the grand jury."

If, as said in *Hirsch's* case, "This enactment was intended expressly to obviate the constitutional inhibition against compelling a witness to criminate him-

self," it was not intended to obviate the constitutional inhibition against compelling a witness to give evidence against himself. Nor do I think it can be maintained that the makers of the Constitution intended the words "give evidence" to mean criminate in its strictly legal sense, they intended to and did use a term of more force and comprehension. Being assembled to make an organic law that body certainly had before them Constitutions of other governments as guides. Certainly the Constitution of the United States, with which that of the State must be consistent, was closely consulted, and the language there is, "shall not be compelled in any criminal case to be a witness against himself." That is with a view to punish him. That this distinction was in the minds of the convention, and that there was a purpose in the difference of phraseology is sustained by the dissenting opinion in *Hirsch's* case, which was prepared by Chief Justice Nicholson, who was a member of that convention, and who as a lawyer, jurist and statesman had no superior in the State, and perhaps not in the Union. In construing the Constitution, in the making of which he was a most efficient factor, he says:

"We do not concur in the conclusion that the Legislature intended, or that they could if they had so intended, to deprive the witness of his constitutional right to refuse to give evidence as to his own criminality." "The act of testifying constitutes the abrogation of the offense under the law. This only occurs after the witness has voluntarily waived his

constitutional right to refuse to testify. If he does not voluntarily waive 'his right he cannot be deprived of it by compulsory law." Mr. Nicholson certainly understood the language he approved, and properly defined it when he came to pass upon it as judge.

The purpose of the act is to offer inducements to persons who have committed offenses against law in connexion with others to divulge the secret. There is nothing compulsory in the language, nor could there be without a violation of the Constitution. It recognizes, by its terms a want of authority in the Legislature to command the witness to testify, and merely offers a reward to him if he has or will do so. The witness may elect to take advantage of the law, or take chances of a discovery and conviction of himself. By it the Legislature proposes to buy the evidence of one guilty man against another or others, and to pay for it by exemption from indictment for the offense in relation to which he has testified. In this case the court has undertaken to compel the witness to give evidence against himself. The Constitution says this shall not be done. The court claims the authority under section 5089. Both the Legislature and the courts are creatures of the Constitution, and must conform their actions to its provisions. The Legislature could not say the witness shall testify, but could and did say, if he will, etc., and the courts can do no more. / The witness must determine for himself whether he will accept the legislative reward offered for his testimony.) Whether the constitutional protection thrown around offenders is

good or bad policy, is a question with which courts and legislatures have no concern. They must support and enforce the Constitution as they find it. Being its creatures they must obey its mandates, and not evade them by strained construction for any emergency, however important to public weal it may seem.

The language of both the Constitution and the statute is plain, simple and unambiguous. The one is positive in prohibiting compulsion, the other simple in its offer of inducement and reward to an offender to betray his fellows by voluntary election to testify for the sake of protection to himself.

At common law the rule is, that if an associate in crime will reveal upon his fellows and testify against parties to the same crime, he may reasonably hope the State will in consideration pardon his offense. It was a part of the rule that the government was not bound to apply it. The object of the hope held out by that rule was to increase the means of discovery and punishing offenses.

Our law-makers recognizing the utility of the rule, but seeing that it did not accomplish to any great extent the ends aimed at, modified it by converting a bare hope into an absolute assurance, making it a positive mandate instead of a discretion resting in the breasts of courts and attorneys-general. So that our statute is nothing more than the common-law rule made certain of application.

Under the common-law rule the offered witness could not be compelled to testify; then why should a different practice obtain under the same rule de-

clared by statute in more direct and trustworthy terms under a Constitution protecting a witness from giving evidence against himself, while the common-law rule is untrammeled by Constitution except as it comes of usage and precedent?

In State against Hartfield, Judge McKinney, with the statute before him for construction, says "*such person* (meaning a person before the grand jury by compulsion) cannot be *compelled* to criminate himself, but as an *inducement* to a full and unrestrained disclosure in regard to others without peril to himself it was deemed politic, *in the event of doing so,* to exempt him from prosecution."

There can be no doubt as to the meaning of this language, it is susceptible of but one construction, which is, that *compulsion* was not intended, and that *inducement* was the sole object of the legislation.

Section 9, Article 1, upon the last clause of which the question arises, is as follows: "That in all criminal prosecutions the accused hath a right to be heard by himself and counsel, to demand the nature and cause of the accusation against him, and to have a copy thereof, to meet the witness face to face, to have compulsory process for obtaining witnesses in his favor, and in prosecution by indictment or presentment, a speedy public trial by an impartial jury of the county in which the crime shall have been committed, and shall not be compelled to give evidence against himself."

The character of the question propounded to Warner distinctly notified him that he was accused of the

State v. Warner.

offense. It located the offense in his property, in the club of which he was president, and of which he was of course a constituent part.

That club was aimed at by the interrogatory. An attempt to involve the club must of course involve each and every member; it takes each and every member to make the one organization, an association. To strike at the club is to strike at its several component parts, and especially at its officers and agents, who are presumed to supervise and direct its proceedings.

The attempt to procure indictments or presentments is the initiation of a criminal prosecution, and no trial can be had until this initiatory step has been completed. Before the grand jury all "criminal prosecutions" must commence, and as soon as a question is asked, the prosecution is on foot. The constitutional declaration that the accused shall not be compelled to give evidence against himself applies in all stages of the prosecution from the very first step to the last. That declaration has no qualification or condition. It is positive and absolutely prohibitory. It contains no word from which it can be inferred that the Legislature or the courts can on account of promises, pledges or enactments compel a person to give evidence against himself. There is nothing from which it can be inferred that because the party may be exonerated from punishment that he may be compelled to give evidence against himself. The fact that he is not to be punished does not remove the fact that he has given evidence against himself. It is the

5—VOL. 13.

*giving evidence* against himself under compulsion that is forbidden..

When the witness has determined to report· upon his fellows, and has done so, implicating himself as fully as he does his companions, can it be said that because his betrayal of his associates saves him from punishment that he has not given evidence against himself? such an assertion is a contradiction in terms. The giving evidence against himself is the consideration he pays for the reward of not being prosecuted and punished for the offense in relation to which he has given evidence against himself and others.

If prosecuted, his plea is, that while he is guilty, he has given evidence against himself; and the law says to him, "yes, you are guilty, your guilt is known, and you are not undeserving of punishment, but you gave evidence against yourself that you might entrap others, and therefore you shall not be punished." At every step we are met with the fact that the witness gave evidence against himself, that he criminated himself, and without it he has not entitled himself to the benefit of the pardoning statute; all of which may be done voluntarily, but not by compulsion. The sole foundation for the assumption that the witness may be compelled to answer is, that he is by his answer exempted from punishment, while the Constitution has no reference either directly or by implication to the punishment.

This seems to me to be rather loose construction. It would be better to read the Constitution as we find it, and if it is defective, leave to sovereig

where the power belongs to change, alter or amend. Especially should this be so in a question that has been pronounced upon by such minds as McKinney and Nicholson, authors of the Constitution, contrary to the construction now insisted for.

Judge McKinney was in the Convention that framed the Constitution of 1834, which contains in its exact words, and by number of article and section the clause now before us.. In 1859 he wrote his opinion in *Hatfield's* case, construing the statute now being considered, and used the language already attributed to him in reference to the Constitution made by himself. That opinion was the undisputed law of the land at the time of adoption of the Constitution of 1870, and Article XI., sec. 1, of the latter instrument is as follows:

"All laws and ordinances now in force and in use in this State not inconsistent with this Constitution, shall continue in force and use until they shall expire, or be altered or repealed by the Legislature." The present law was in force and use and not inconsistent with the Constitution, nor has it expired, been altered or repealed.

In all questions involving the meaning of statutes and the intention of the Legislature, it is the duty of courts to construe and define that meaning, and when that is done the statute as construed is the law of the State. So that when the ordinance just cited was adopted, it made this statute, as construed by the court, the law, to be understood in the light of the decision. The Convention is presumed to have

known the law as construed, and to have so adopted it, and to have framed the Article in question expressly with a view to the construction already given by the courts, when it transferred the language of the Constitution of 1834 to the Constitution of 1870, it as fully transferred the defined force and meaning of that language, and intended to do so.

In the consultation room two questions are raised which were not suggested on the hearing: First, that there is no bill of exceptions; and second, there is no right of appeal in contempt cases.

The first is predicated upon a recital upon the transcript, which is evidently the officious act of the clerk, made for convenience, and no part of the record as made by the court. That recital has its place in the transcript immediately after the order remanding the defendant to jail, and is as follows:

"The above and foregoing is of record on the minutes of the court, and the following is what the judge signed as accruing on the motion to vacate the judgment."

After the recital the record is as follows:

" In the matter of B. R. G. Warner on contempt. This day came into court B. R. G. Warner, and by his counsel moved the court to set aside the order or judgment in contempt entered up by the court against him March 12, 1884, and on the motion the subpœna under which the said Warner appeared before the grand jury was presented, which is as follows," (setting it out with its endorsements). Following these in regular order is the evidence already

cited in this opinion, and concluding: "The court refused to vacate the said order or judgments in contempt, to which action of the court in so refusing to vacate the said order or judgment of the court, the said B. R. G. Warner excepted, and still doth except. The above is what occurred on the motion to vacate the judgment. This March 14, 1884. James M. Greer, [seal], Judge of the Criminal Court of Shelby County."

Following this is an order reciting a prayer for appeal from the judgment, and also from the action of the court refusing to set the same aside, concluding, "To which action of the court the said B. R. G. Warner excepted, all of which appears of record. James M. Green, Judge, etc. This March 14, 1884."

I am unable to see wherein this is lacking in being a bill of exceptions. The truth of the case is fairly stated, is signed by the judge, and is recited to appear of record.

Sec. 2968 of Code is: "The truth of the case being fairly stated in the bill of exceptions, the judge shall sign the same, which thereupon becomes part of the cause."

Is the truth of the case fairly stated? His Honor, the trial judge says so over his official signature and seal. His signature without the seal made the bill of exceptions a part of the record. The statute makes no allusion to the minutes of the court as kept upon its books.

The statute was construed by this court in *Grubbs* v. *Greer*, 5 Cold., 162. The court says: "It is in-

sisted for the defendant, it not appearing on the minutes of the court, the bill of exceptions *was signed and sealed and made a part of the decree it does not become a part thereof.* We do not think so. By the provisions of section 2968 of the Code *it is made* " *a part of the record.*" " The truth of the case being fairly stated," etc. This section is conclusive of the question: " *It is the usual formula to enter upon the minutes the action of the court, but it is not necessary to do so to make the bill of exceptions a part of the record.*"

This holding was re-affirmed in *McGavock* v. *Puryear*, 6 Cold., 39, the court saying " It is not necessary under the rulings of this court in the case of Grubbs against Greer, that the minutes of the court should show the bill of exceptions was signed, sealed and made part of the record."

In *Ferrill* v. *Alden*, 2 Swan, 79, the court says : " A bill of exceptions is for matter excepted to at the trial and ascertained before the verdict," etc., is sufficient *if the exception* be taken at the trial and noticed by the court, and it may during the term be reduced to form, and signed by the judge.

So that it is clear beyond doubt that a truthful statement of the case and exception to the action of the court, signed by the judge, constitute a complete and perfect bill of exceptions, and such is this record in every particular to the smallest detail.

It is next objected in the consultation room, and not by counsel on either side, that there is no right of appeal, and several cases are cited in support of

the position, one of them, *Burks* v. *Fleming,* 6 Baxt., 333, gave the right of appeal, and held, "The principles of the organic law of the State, as well as of the long established practice of the courts require a very liberal construction of the right of appeal to those whose liberties and property are *in any manner endangered. It is by such right that petty tyrannies can be kept down in republics."*

I now ask, did this court ever at any time since the decisions were made, regard *Martin's* case, 5 Yer., 456, or *Galloway's* case, 5 Cold., 335, or the copied illustrations from the two cases in *Fleming's* case, 6 Baxt., 381, as conclusive of the question of the right of appeal? I undertake to answer positively, no.

The reasoning in the older cases is an argument of inconvenience, an element not admissible of consideration on the trial of a question involving the liberty of a citizen.

In *Hirsch's* case, 8 Baxt., 92, the court says: "It is insisted by the attorney-general that the contempt being committed in the presence of the court, the defendant had no right of appeal from the judgment. How this may be we do not undertake now to decide as the main question is decisive of the case." If this language means any thing, it is that the cases already cited did not settle the question, and that it was an open one. If a majority of the court had have been of opinion that the question of right of appeal had been settled, it was wholly unnecessary to go into the merits of the case. From some cause, regardless of *Martin's* and *Galloway's* cases, and the quota-

tions in *Fleming's* case, the question of the right of appeal was not decided. The court would "not undertake to decide it." If it had been decided, and the court felt it was bound by the decision no undertaking to decide, nor the reason given for the refusal to so undertake was called for.

It would seem, in view of the cases referred to, that a declaration on the part of the court of the kind made, was an admission that the decisions were not only not satisfactory, but were not sound, and that a majority at least thought the right of appeal did exist.

In *Hundhausen* v. *Marine Fire Insurance Co.*, 5 Heis., 702, a contempt case, this court speaking through Judge Freeman, said: "The action of the chancellor in a case of contempt, such as is before us in this record, is subject to be reviewed, and that writs of error and *supersedeas* were applicable and appropriate as the remedy of the party, *and the motion to discharge the supersedeas will be discharged.*"

Judge Freeman also says in that case: "This court is the supreme tribunal of the State, and other courts inferior in the sense of being subject in their action to the jurisdictional control of this court, as the appellate tribunal *over all such judgments and decrees* as they may render affecting the life, *liberty,* property or *rights* of the citizen of the State. The Judge adds: "The particular mode in which this jurisdiction may be exercised, whether by appeal in the nature of a writ of error, or by writ of error and *supersedeas*, is a matter of regulation by the Legislature, and such restrictions and regulations may

be enacted by the Legislature as may be deemed proper *so as not to defeat the ultimate control of this court as the Supreme Court of the State over the inferior courts ordained by the Legislature."*

In *Harwell* v. *The State,* 10 Lea, 544, Chief Justice Deaderick delivering the opinion of the court in a matter of contempt said: "The grand jury is a constitutional part of the court, and any illegal or corrupt interference with them in the discharge of their duties, or attempt by outside influence to control their action would be a contempt of court for which the offender should be punished. But we hardly think the facts disclosed in the evidence are of the character indicated. The judgment of fine and imprisonment was reversed.

In *Page* v. *The State,* 11 Lea, 202, in an opinion delivered at this place one year ago, Judge Cooper, speaking for the court, said: "The statute making it a criminal offense to retail spirituous liquors on Sunday is intended to punish the seller, not the buyer, and the latter may therefore be compelled to testify as a witness on the trial of the indictment against the seller, and may be punished for contempt in refusing to testify." The judgment of fine and imprisonment was affirmed. The opinion concludes: "No point is made as to the right of the appellant to appeal from the judgment." No point is made as to the right in this case. If, because the point was not made in the one case it assumed jurisdiction of its merits, why decline in the other with precisely the same surroundings. If, in

*Hirsch's* case, the point was made, why should the court give it the go-by, and decide the matter upon its merits?  Why should it assume to raise the question here of its own motion?    Then we have five cases distinctly recognizing the right of appeal, all since the cases of *Martin* and *Galloway,* and directly in their faces.    For a period of thirteen years the right of appeal has been recognized and practiced upon by this court.    The profession recognizes the change of the rule.    The change is consistent with our institutions.    If we ignore what we have done, and the practice we have so often adopted, and go back to what is claimed to be the old rule, how will the profession ever know a rule to be settled even for the conduct of the members of the bench who have announced it?    Do we write to confuse?

If the right of appeal was settled not to exist, the court had no jurisdiction to try the cases cited.  It was the duty of the court to have stricken them from the dockets whatever may have been their facts, and not to have trespassed upon the exclusive jurisdiction of inferior courts by affirming and reversing on the merits as we understood them.

For one I do not believe any power exists in the courts or Legislature to restrain any citizen from being heard by all the constitutional courts of the State in *any and all matters* involving life, liberty or property.    The right of appeal in some form exists in every case, whatever the form of proceedings, and continues till passed upon by the court of last resort, the Supreme Court.

State *v.* Warner.

It seems to me the reasoning in the case holding that this court may not review contempt cases is not well supported. It is said that "if a writ of error did lie from a judgment of contempt, courts of justice as such could not exist to any useful purpose in times of excitement and turbulence, because they could not protect themselves, etc. That a witness who refused to give his evidence, in contempt of the court, and was to be imprisoned, might pray the writ, and it would be impossible to coerce him," and yet these cases hold that if he is improperly imprisoned, the writ of *habeas corpus* will furnish relief. Now the writ of *habeas corpus* may be issued by the *fiat* of a different judge to the one who committed for contempt, and he may try the right to the writ. By the service of the writ the contumacious witness is taken out of the control (for the time being at least) of the committing judge. The judge trying the right hears the facts of the case, and may discharge the witness entirely, or he may remand him to prison, If the proceedings in the court of the one judge may be thus interfered with by the judge of another, and the action of the latter judge make it impossible for the former to coerce a witness, by what process of reasoning can it be held that the same results may not be reached by writs of *supersedeas* from this court.

The case is tried upon the same facts. The action upon the writ of *habeas corpus* is final if there is an order of discharge. The writ of *supersedeas* is only the means of bringing the matter to the attention of this court. The *fiat* decides no question and cannot

defeat the punishment for contempt, for if the facts satisfy this court that the order of imprisonment was proper, it will be affirmed and enforced. In the *habeas corpus* proceeding we have the opinion of a single judge, in the *supersedeas* proceeding we have the opinions of all the judges of the court of last resort as an authoritative settlement of the questions made.

In the one case one judge may be of one opinion and another of a different one, and the rules of law and practice may be and are different in the several circuits. Neither is authority to the others, while the decisions of a court of last resort control throughout the State. If a case falling under the illustration put in the old cases should arise (as is not at all probable if even possible), no judge of this court would grant the writs of error and *supersedeas.* It is always in the power of the committing court to force the offending party to resort to the *supersedeas,* and it would be his duty to do so in cases as extreme as the illustrations of the older cases, or even when he was of opinion the contempt was in the least outrageous in its character.

In *Hundhausen* v. *Marine and Fire Insurance Company,* Judge Freeman intimates pretty clearly, that writs of error and *supersedeas* are the remedy in cases of contempt: 5 Heis., 712.

If the argument " *ab inconvenienti* " is to obtain for any purpose, why not extend it and say that it would be dangerous to permit the arbitrary power of imprisonment to vest in the bosom of a judge in times of excitement and turbulence, because he might then un-

State *v.* Warner.

lawfully and oppressively imprison a witness for refusing to answer an illegal and impertinent question propounded for the advancement of partisan purposes? The integrity of the citizen may be as safely trusted as the integrity of the judge. Both owe the same allegiance to law which they are presumed to know.

Judge Smith says in *Galloway's* case, 5 Cold., 336: "If the judgment for the contempt be for cause for which the court has not jurisdiction, and it so appears upon the record, the judgment is void and no justification for the imprisonment. It stands on the law of universal application to the judgment of courts, that if the court has no jurisdiction, the judgment is void." I ask who is to decide whether the judgment be void? Is it to be done by a judge of co-ordinate jurisdiction, or by a court of appellate jurisdiction? Is one circuit judge, one chancellor, or one judge of a criminal court to review and affirm or reverse others with the same jurisdiction, or must it be done by a court of appellate jurisdiction? If a judgment is void it can only be vacated by the court rendering it or by a court of appellate jurisdiction. The validity of the judgment here depends upon the construction of the statute, which this court alone can authoritatively construe. It is a strange holding, in a cause originating in the criminal court, the judge of that court giving one construction to a statute and the circuit judge a different one, or *vice versa*, that the opinion of the latter is conclusive, not only upon the former, but also upon the Supreme Court. Yet such is the inevitable logic of the theory that *habeas corpus* is the only remedy

in contempt cases, and no appeal lies.   I cannot sub-
scribe or assent to any such restrictive construction of
the constitutional guarantee.   " *That all courts shall be
open*, and every man for any injury done him in his
lands, goods, *person* or *reputation*, shall have remedy
by due course of construction of law, and right and
justice administered without sale, *denial* or delay":
Const., Art. 1, sec. 17.

I am unable to comprehend the soundness of that
judicial reasoning or the authority for its holding, by
which the doors of this constitutional court of last
resort—and most important of *all courts*—are closed and
barred against him who claims in any lawful proceed-
ing to have been injured in *person* or *reputation*.   This
is the "*denial*" which is condemned and positively
prohibited by the instrument that created this court,
and to which this court swears support and allegiance.
Let him, who can, explain on reason sounder than
that of inconvenience—a reason unknown to the Con-
stitution, and one that cannot be extracted from it,
however much it may be tortured by construction.   A
reason that as well applies to all criminal proceedings
as to contempt and *habeas corpus* cases.

Chief Justice Deaderick and Judge Cooke concur
in the opinion that the subpœna was unlawfully issued
and gave no jurisdiction.   That the bill of exceptions
is perfect, and that the writs were properly granted.

The *supersedeas* is made perpetual and the petitioner
discharged.

State *v.* Warner.

DEADERICK, C. J., delivered the following opinion:

In the criminal court of Shelby county the plain· tiff in error was imprisoned for alleged contempt of court, in refusing to answer questions, proper in themselves, propounded to him by the foreman of the grand jury in the room of said jury, and in their presence, touching his knowledge of unlawful gaming. He had been summoned, by service of subpœna, to appear before· the judge to testify on a day named.

The record discloses that the foreman of the grand jury with the witness appeared in open court, and informed his Honor that the witness had refused to answer whether he knew of any unlawful gaming for money in the Gayoso Club rooms over his saloon, and similar questions as to gaming, within the last six months.

The defendant persisting in his refusal the court ordered him to jail for contempt, there to remain until he should purge himself of the contempt, or be otherwise delivered in due course of law. From this judgment defendant prayed an appeal, which was refused, and he was committed to jail. He presented a transcript of the record of the proceedings of said criminal court to one of the judges of this court, and prayed for writs of error, *certiorari* and *supersedeas*, which were granted, and the case is now before us for final disposition upon the questions as to whether we have any jurisdiction to revise the judgment, and if so it is erroneous.

The record consists of a transcript from the min-

utes of the court, and the certificate of the judge of
what transpired on the trial of the cause, officially
signed by him during the term of the court. We
think this was intended for, and is in every essential
particular, a bill of exceptions, and is a part of the
record in the cause. From this record it appears that
the subpœna to testify was issued upon the order and
at the instance of the attorney-general, and that the
grand jury did not order or direct the issuance of
any subpœna requiring the witness to appear and testify
before them. This power the grand jury have in cer-
tain cases specified, gaming being one of them : Code,
secs. 5087, 5787 *a.* But this power being in deroga-
tion of the common-law cannot be extended beyond the
express provisions of the statute : 4 Cold., 195; 1
Swan, 19; Meigs, 99.

The attorney-general has no power to direct wit-
nesses in such cases to be sent before the grand jury,
nor has the court, but the "grand jury shall have the
right and power" to send for witnesses under said
sections, and they only.

Our statutes define what shall constitute contempts
of court, and directs that the offense shall not be con-
strued as extending to any other acts than those
specified.

The third specification is "the willful disobedience
or resistance of any officer of said courts, party, juror,
witness or any other person, to any *lawful* writ, pro-
cess, order, rule, decree or command of said courts."

It is under this sub-section 3, if at all, that the
validity of the proceedings and judgment of the in-

ferior court can be maintained. But in my opinion the judgment cannot be upheld and maintained under this sub-section, upon the ground that the judge had no *lawful authority* to order defendant to do the act, for his refusal to do which, the punishment was imposed. To constitute the offense there must be willful disobedience of a *lawful order* of the court. The judge had no lawful power to compel another, although in his court room [and presence, to go into the grand jury room and testify as to his knowledge of unlawful gaming. This power resides in the grand jury only, and then by subpœna issued by their order. So that to make disobedience of an order of court[7] contempt, the order must be one which the court has the power to make, it must, in the language of the statute, be a "lawful order."

In this case we think the court below had no power under the facts disclosed to imprison the defendant, and that the writs of *certiorari* and of error were properly used to secure the revision by this court of a judgment which the said court had no jurisdiction or right to render.

For these reasons I concur in the conclusion announced by Judge Turney, that defendant should be discharged.

COOKE, Sp. J., concurs in the foregoing opinion.

FREEMAN, J., delivered the following dissenting opinion:

This case brings before this court certain proceedings in a matter of contempt had in the criminal

6—VOL. 13.

court of Shelby county, Judge James M. Greer, pre-siding.

I find two records before us, and a proceeding on *habeas corpus* before Judge Pierce of the circuit court of Shelby county, in which he refused to discharge defendant, Warner, from imprisonment under the judgment of Judge Greer. This is brought before us, under a *certiorari* issued under a *fiat* of one of the judges of this court.

We take it to be too well settled that the action of a judge or court on a writ of *habeas corpus* cannot be reviewed by this court under any form of procedure, to demand any discussion or investigation : *State ex rel.*, etc., v. *Malone et al.*, 3 Sneed, 416–17 ; *State* v. *Galloway & Rhea*, 5 Cold., 335, *et seq.* This record need not be further noticed.

The case is this, as shown by the record : On March 12, 1884, the minutes of the court show that C. B. Bryan, foreman of the grand jury, then in session, " came into open court, accompanied by B. R. G. Warner, and also the attorney-general. Whereupon the foreman stated to the court that said Warner had been examined before the grand jury as a witness, and had refused to answer the following questions, to-wit : " As to whether said witness knew of any unlawful gaming for money in the Gayoso Club Rooms over his saloon ; that the witness had refused to answer this and other questions of a similar character touching his knowledge of unlawful gaming in the last six months. The foreman stated that he had informed witness that he would be required to answer said questions, or the

State *v.* Warner.

foreman would be compelled to bring him before the court. The witness still refused to answer, and he had him before the court. Whereupon the court inquired of the witness, upon what ground he based his refusal. Witness replied that he was president of said Gayoso Club; that there was some sixty members of said club, and he did not desire to speak of any thing pertaining to the club. He also said that his answer *might* criminate himself, and therefore he had refused to answer. Whereupon the court instructed the witness that a person was not liable to prosecution for any information given before the grand jury touching any misdemeanor in which he might have taken part, hence he could not criminate himself even if he had answered that he had been engaged in said gaming, and that he could not be prosecuted. Whereupon the witness said he still felt compelled to refuse.

The court then informed him that it would be the duty of the court to commit him to jail for contempt until he would answer; that he hoped the witness would think better of his refusal, and not impose upon the court this disagreeable duty. Witness replied he would still refuse. Whereupon the court adjudged that said B. R. G. Warner be held in contempt of this court, and committed to the body of the county jail of Shelby county until he shall have purged himself of said contempt by answering said questions, or else delivered therefrom by due process of law. That he pay the costs of this proceeding, and execution issue for the same. Thus the proceeding ended by a final judgment.

On the next day the defendant in person and by attorney—the attorney-general being present—moved the court to vacate the judgment heretofore entered on the minutes of this court, holding the defendant in contempt, and committing him to jail, which motion was overruled by the court.

Whereupon the defendant prays an appeal in the nature of a writ of error to the next term of the Supreme Court, which said appeal is refused, and the defendant was remanded to jail in accordance with the judgment heretofore rendered.

It was settled by this court in the case of *Hirsch* v. *The State,* 8 Bax., 89, after much discussion of the question, that a witness summoned before the grand jury under subpœna could not refuse to give evidence as to violations of our laws against gaming, on the ground that he might criminate himself. Section 5089 was held to exempt the witness in such cases.

We have no doubt of the correctness of this case, and do not deem it necessary to re-examine that question. The answer, however, to the argument of the majority opinion is not by the simple fact that he cannot affect himself legally, when the State has said he shall not be prosecuted in such a case. This meets the whole point in it, unless we hold that whether it can legally affect himself or not, he is still protected. In fact, as I understand it, this is the theory of the opinion. If so, I venture to say that the conclusion is not sustained by any authority to be found in our law—whether text-book or decision.

Up to this point there can be no question the

State *v.* Warner.

judgment of the criminal court is correct. The witness had persistently refused to answer the questions which had been put to him. They were proper questions in investigating the fact whether gaming in violation of law had occurred within the knowledge of the witness. The court had acted most considerately to the witness, and explained to him that he could not involve himself by his answer, and even urged him to reconsider his refusal. He still persisted in his refusal. This, in connection with the reasons given by the witness for his refusal, admits of but one conclusion, that is, that the witness had determined not to inform on his friends, the members of his club; for the only reasons given for refusal were that he was · president of the club, and did not wish to speak of any thing pertaining to the club, and also that his answer might criminate himself. This last objection was removed by the explanation given by the court, and that this was not a controlling reason for his refusal is seen by the fact that no doubt is expressed by the witness as to the correctness of the explanation of the law as given by his Honor on this point. That no sufficient or even plausible, legal justification for the witness' refusal to answer the questions propounded before the rendition of his Honor's judgment, the statement we have given makes certain. Upon the case as it stood before his Honor when the judgment was rendered, we have only a contumacious witness, who, on an assumed point of honor, had determined to brave the court, defy its authority, and take the consequences, thus putting himself in the

way as an obstruction to the enforcement of the crim-
inal law of the land. It will be seen that afterwards
the effect of counsel was to shield him from the con-
sequences, and give him a triumph over the court by
matter presented *ex post facto,* which had never been
thought of in the inception of the case, nor until
after a final judgment had been rendered.

On this statement of the case it clearly appears
this is not a case that appeals to this court for any
liberality of construction in order to shield the de-
fendant, or to favor the application of mere techni-
calities, that he may elude the grasp of the law. We
should be slow to find mere technical error that would
give this defendant immunity and an apparent triumph
over a court acting under an evident sense of duty
to enforce the law of the land, and maintain the dig-
nity of the judiciary.

It appears from a statement signed by the judge,
and "filed," as the record says, "by the defendant,"
but not ordered to be so filed, or made part of the
record in this case by the court; that on this motion
to vacate the judgment already entered on the 13th
of March, the motion being on 14th, the subpœna
under which Warner had been summoned to appear
and testify before the grand jury was read. This
commanded the sheriff to summon him to appear be-
fore the criminal court, then in session, "then and
there to be sworn, to tesfify and give evidence before
the grand jury sitting, in behalf of the State con-
cerning his knowledge relative to a bill of indictment
to be preferred against divers persons for the offense

·of gaming committed within the county of Shelby." The subpœna is endorsed on back of it: "State of Tennessee v. General Information. Grand jury subpœna. Issued March 14, 1884, and executed same day by the sheriff's deputy."

It is then stated that it was admitted by the attorney-general that the subpœna was issued by his instructions and not at the instance of the grand jury, and said Warner was not sent before the grand jury ·on any indictment against any individual. It is further said, that the members of the grand jury, as well as the attorney-general, interrogated the defendant when he appeared under the subpœna. A copy of the constitution and by-laws of the Gayoso Club is also added to the statement.

This is the entire case as it stands in the record.

Treating this statement so signed by the judge for the present as a bill of exceptions, the first question for consideration is, has this court any revisory jurisdiction over the case. If not, then the contest would properly end at this point, and we need not ·discuss or decide the other questions that may be raised on the facts stated.

The case presented by the facts before the court, and on which his original judgment was rendered, make a case of contempt in the presence of the court, in the face of its authority, a direct personal contest between the court and the defendant in open court. This, we take it, cannot be doubted. It is this or nothing. The question then is will an appeal, writ of error, or ·any other revisory proceeding lie in this court in such

a case?    The judgment, it is proper to say, is valid!
on its face beyond question, reciting the facts clearly
showing the contempt, with no recital affecting its va-
lidity in any way.

In the case of *Andrew L. Martin, ex parte*, 5 Yer.,.
456, it was held that "an appeal in the nature of a writ
of error does not lie from the order or judgment of a
court punishing a party for contempt." This case was
decided in 1830, and was based, as Judge Catron says,
on *Shumate's* case at Nashville in 1823 or 1824, of
which case he says: "Much pains was taken with that
opinion, where the authorities were cited." He adds:
"It is most obvious, that if a writ of error did
lie from a judgment for contempt, courts of justice,
as such, could not exist to any useful purpose in times
of excitement and turbulence, because they could not
protect themselves from assaults that would prevent
their sittings." One illustration given by the learned
judge in support of the conclusion of the court, is .
analogous to the one now before us. "Suppose a crim-
inal cause on trial before a jury, and a witness refused
to give evidence in contempt of the court, and he was
ordered to be imprisoned, to coerce him to depose on
behalf of the defendant or State, he prayed an appeal
or writ of error and continued at large. How would
it be possible to coerce him to depose? To the same .
end as imprisonment may a fine be imposed by the .
court, not exceeding fifty dollars."

The foregoing, he concludes, are given "as instances
why consistently with the existence of courts of justice,.
writs of error dare not be allowed to revise judg-

ments for contempt. Not that the case before the court presents the least enormity. The facts as set forth in the bill of exceptions, show very slight misbehavior by a member of the bar, still were the writ of error· entertained in this case, it would equally lie in any other case, the most enormous and aggravated."

The remedy always open to the party if unlawfully imprisoned, is by *habeas corpus,* and as Judge Catron says, "no doubt relief could be afforded by this constitutional writ." The above is the language of the court.

This question came again in review in a case that created as much interest at the time, probably, as any ever occurring in our courts, *State* v. *M. C. Galloway and W. H. Rhea,* 5 Cold., 327. It was argued most zealously and with great ability by some of the ablest counsel in West Tennessee—the authorities examined thoroughly. The opinion by the late Judge Henry G. Smith, is one of marked ability, in which the precisely same result ·is reached as in the *Martin* case. The only modification made in the general law on the subject is, that the judgment is required by that opinion to state upon its face the cause of contempt alleged, as the ground of the jurisdiction on which the judgment is rendered, otherwise it would be invalid. This furnished the safe basis for relief at all times under a *habeas corpus,* and is as far as public policy demands, as held by these cases, as well as the general current of authority.

Again, in the case of *Brooks* v. *Fleming,* the question of contempt and revisory power of this court came

under review. This was a case of a motion to attach Fleming for violation of an injunction. The chancellor convicted in that case, and appeal was prosecuted to this court. The case of violation of an injunction, or like process, not being in the presence of the court, and to be brought, in the language of the judge delivering that opinion, "to its knowledge on the testimony of others," and upon issues made, was held to be an exception to the "general rule, and the appeal allowed.

But in the opinion in that case by Judge Turney, the doctrine of Judge Catron in the case of *Martin* as to contempts in the face of the court is emphatically approved. He says: "On principle the right of appeal to the party charged is clear *when* the contempt is not in the face of the court. That it will not lie in such case is for the strong reasons instanced by Judge Catron in the case of *Andrew L. Martin ex parte*, 5 Yer., 546, as well as others, which he proceeds to give," beyond question.

I had the misfortune to differ with my brethren of the Bench on that question, but they are agreed, and I stood alone—was compelled to acquiesce, and feel bound to do so now, as a question too well settled to be disturbed or reopened. Unless we shall overrule all that has been decided, and so long approved in these decisions, this case ends here, and this court has no jurisdiction over the question.

I but add for myself, using the illustration given by Judge Catron in the 5th Yerger case, that it would scarcely be held a valid answer to a refusal by a

witness in a case on trial, when he refused to obey the order of a court to testify, that he should make the objection that he had not been regularly summoned, or even had been summoned under a subpœna that called for and authorized the summoning of another and different man, or it had been issued at the instance of a man not authorized to demand the issuance at all.

The consequences of allowing an appeal or writ of error in such cases reach too far, and are too vital, as said by Judge Catron, to the very existence of courts. Suppose the case of half-dozen roughs or gamblers, who have been guilty of violations of law, and wish to prevent a term of court being holden, in order to get the benefit of the statute of limitations. They go into the court-room, and by noise and turbulence stop the public business. The court adjudges them guilty of contempt, and they appeal, free to repeat their offense. . It is seen the only protection of the court is not his power by law as a court, but in his personal ability to contest his right to hold his court.

Again, in gaming cases, the witness has but to refuse to testify, however regularly summoned. The court can but render a judgment of contempt from which he appeals, and before the appeal can be disposed of in this court six months have expired, and if he is sent back, he may answer willingly, and purge his contempt—his friends are saved, but the criminal law has been trampled in the dust. In fact such a practice would serve practically to give

State *v.* Warner.

parties violating the gaming laws immunity from all punishment in the future. These laws had as well be repealed as to the largest class of such offenders.

It may be said the party will be imprisoned for contempt on reversal in this court. But we take it this would not be done if he answered or gave testimony, which he could well do, as no one could be injured by it.

The case put by Judge Catron of a witness refusing to testify on a criminal or even civil trial serves also to illustrate the necessity of the rule. The court adjudges him guilty of contempt, but he appeals, defies the court, goes free till his case is heard by this court. In the meantime the case must stop, a mistrial be had at cost of the State or the parties, and the case be delayed till his appeal be heard in this court. In this way it is seen that the wheels of justice may be stopped by a recalcitrant witness whenever he chooses. Such consequences show the wisdom and necessity of the rule as held by this court from 1824 down to the present time. Nothing is seen in this case demanding its change—on the contrary, as we think, every thing that does appear demands its enforcement, and an emphasis that shall be felt, and thus close the question forever.

In all the cases cited by Judge Turney the question of right of appeal was not made or decided, or were not cases of contempt in the face of the court as this is. The case cited from 5th Heiskell, *Hundhausen* v. *Marine Insurance Co.*, opinion by myself, was a contempt for violation of an injunction out of

court—the precise case of Fleming against Brooks—in which Judge Turney emphatically distinguished between the two class of cases, giving appeal in one case, refusing it in the other. I sought in the *Brooks'* case to carry the right to cases of contempt even in the face of the court, but was overruled by my brethren, Judge Turney delivering the opinion. This view has never been overruled till now. That case is in perfect accord with my present position, while Judge Turney is inconsistent with his opinion in the Brooks' case.

But entertaining the jurisdiction of this court, and treating the statement signed by the judge as a bill of exceptions, as I do not think it is, showing that on the motion made to vacate the judgment, it did appear that the subpoena in this case was issued by instructions of the attorney-general, and not at the instance of the grand jury, and that Warner was not sent before the grand jury on any indictment against any individual, what would be the result?

This, in the first place, presents the question whether a party can in a case like this, on motion for a new trial, or it may be conceded even on the original trial, interpose the objection that the summons on which he appeared was improperly issued, or issued at the instance of a party who was not authorized to issue it, and thereby successfully sustain a refusal to answer questions put to him as a witness.

After careful reflection I conclude the defense cannot be made.

The subpoena is regularly issued by a court of com-

petént jurisdiction, is on its face complete, and for a lawful purpose, that is that the witness "may be sworn to testify and give evidence before the grand jury then in session in behalf of the State concerning his knowledge relative to indictments to be preferred against divers persons for unlawful gaming within the county." The party regularly appeared in answer to the summons, and the grand jury by their foreman adopted the subpœna as shown, and regularly propounded the proper questions to him, 'under their inquisitorial power in such cases. If the foreman had gone and demanded a subpœna, he would have got a precise counterpart of this one. He has the party under this one before the body, and no reason furnished by any public policy, law, or tending to aid in the administration of public justice is seen, why the form should be gone through of getting another? Suppose the foreman had applied for a subpœna for Warner, and been told by the clerk that one had already been issued, and he had said that is sufficient, and gone on to act under it, as in this case, could we so far stick in the bark in favor of technical routine, as to say the witness could refuse to answer when before the grand jury, because the attorney-general and not the foreman had applied for the subpœna? There is no difference in principle in the two cases. In the one the foreman adopts the subpœna already issued, but before the party comes before the grand jury, and the other does so afterwards, by using the witness and treating him as regularly summoned. This is shown by the fact that the foreman puts the question, and on his refusal to

answer takes him before the court, reporting his refusal. It is said, however, the grand jury alone has inquisitorial power, that is the language of section 5087. "The grand jury shall send for witnesses whenever they or any of them suspect a violation of the laws against gaming." Conceded. But that body sends through the agency of a subpœna, or summons issued by authority of the court, and when a witness is before them by such summons, and they treat him as a witness for the purpose thus authorized by law, I know of no rule of law, nor principle of sound public policy, which requires courts to go behind all this, and see if the proper person requested the subpœna to be issued originally, or that a witness may be protected in not answering a question pertinent to an inquiry that body is authorized to make.

Suppose the witness should have answered and given information of gaming, and that he had been engaged in it himself in the particular cases, would there have been practically the slightest danger that he would have been indicted on the information thus given? Assuredly not. If he had been, however, then is there any legal danger of his being injured?

He would simply have filed a plea stating the fact, that he had been summoned before the grand jury to give evidence as to gaming, and had given information in the particular case, and this had been the basis of the indictment found against him, and on proof of this he would most assuredly have been directed to be acquitted by the court, as held by Judge Greer in his exposition of the law in this case. Suppose, how-

ever, the attorney-general had replied, admitting the
subpœna, but that in fact he had applied for the sub-
pœna, and not the grand jury. Would such a repli-
cation have been held good? Might not the defend-
ant say, I know nothing of that, the grand jury had
me before them under authority of the court, and put
the questions. I know by law that body had the
power to inquire into and discover violations of the
gaming laws, and so I did not choose to contest their
authority. Would there have been any answer in
fairness or justice to this defense? But the case of
the *State* v. *Hatfield,* 3 Head, 231, is thought to
maintain a different view. I do not think so. The
whole point in the decision, and all that was ruled
by the court is given correctly in the syllabus as fol-
lows: "The provision of the Code, sec. 5089, exempt-
ing a witness from prosecution for any offense in re-
lation to which he has testified before the grand jury,
does not extend to and embrace a grand juror, who
communicates to his fellow-jurors his knowledge of a
crime having been committed, and in doing so, vol-
untarily implicates himself."

In distinguishing this case from the case provided
for by the section of the Code, Judge McKinney simply
said: "The term 'witness' in the statute must be un-
derstood in the legal sense, and it is obvious from
the context, can only be applied to a person brought
before the grand jury, by compulsion, to testify against
others. Neither the letter nor spirit of this partic-
ular exemption applies to the case of a *grand juror*
who voluntarily criminates himself." He simply puts

the case of a witness summoned as the one protected, and the one who is not, but voluntarily gives information as not. That is all in this case. He certainly did not hold, nor would that court have done so, we take it, that if compelled in fact by a subpœna to appear, and he does so appear, and give testimony, that he would not be exempt if the State could show an irregularity in the issuance of the subpœna. On the contrary, his language fairly implies, if any thing, the contrary.

I hold, that the subpœna being on its face from proper authority, and complete as a process from such a court, the witness is bound to obey it—it is compulsory on him. The consequences of the opposite doctrine would be in every case where a witness is subpœnaed, he would be compelled, before he answered in cases that might affect himself, to go and at his peril ascertain that the process was issued at request of the proper authority. If he failed to get information correctly on this point, he would answer at his peril. He could seldom know any thing on the subject, and so before he answers must be subjected to the trouble of making the inquiry, and then take the responsibility of making a mistake. This is to impose a burden on the witness not in accord with justice or the analogies of our law. In all other cases, as an officer serving process, he has only to look at the face of the paper and see that it is not void on its face, and he may go on to obey it without fear. He is not compelled to look behind the process itself.

Why should a witness have a different rule applied

7—VOL. 13.

to him? Why should a contumacious witness, as in this case, who seeks to shield his friends who have violated the law, be permitted to invoke for himself a rule that should impose such burdens on others, or why should courts listen to such an appeal? I confess I see no reason consistent with law or sound policy that demands it—on the contrary, much that forbids it.

Since writing the above, I find in a note to the case of *Dougan* v. *District of Lake Co.*, Am. L. Reg., vol. 22, page 530, the decisions, both English and American, collected. The rule resulting from them is thus given by the Supreme Court of Colorado: "The power of punishing for contempt is inherent in all courts. It is absolutely necessary they should possess it, whether expressly given or not by statute, and when the court has jurisdiction of the class of cases to which the action belongs, unless a want of jurisdiction in the *particular* case affirmatively appears on the *jace* of the proceeding, no error on ruling, no *irregularities* in the proceeding will divest it of its power." That the court has, through its grand jury, jurisdiction of the class of cases now under investigation is beyond doubt. This conceded, irregularities in the form of proceeding go for nothing in a proceeding for contempt.

Again, it is held the refusal of a witness to answer before the grand jury is a contempt of court of the United States, in a case before the District Court: Am. L. Reg., vol. 20, 98. And where a contempt is committed in the presence of the court, the court has

*immediate* jurisdiction of the person of the offender and may punish at once: *Middlebrook* v. *State*, 43 Conn., 257; 3 Clarke, Iowa R., 69.

In the face of all this uniform authority, we are unable to see any thing in this case that demands it should be disregarded, or on the first point of right of appeal—our own cases overruled—that this defendant shall escape punishment, or be enabled to shield his friends from prosecution by defying the authority of the court having jurisdiction to enquire and punish, if guilt be proven.

It is argued with great earnestness, however, that there is danger to the citizen if the attorney-general shall thus be allowed to send for witnesses. I am unable to see the imminence of this assumed danger. If the grand jury have not exercised in fact their inquisitorial power, then the parties indicted have but to plead and prove the fact, and the plea will be sustained and the indictment quashed. Is not this sufficient in such cases? Here in fact is where the error, if any, may fairly be urged as a defense, and be legitimately heard, but not by the witness in support of his refusal to answer.

It is not improper to say here, that the writer of this opinion has never been able to sympathize with the very common prejudice against the inquisitorial power of grand juries. It is the body under our law for the purpose of ascertaining violations of law, and bringing men to punishment who have been guilty. As said to me lately by an experienced circuit judge, he had seldom known a man indicted by a grand jury

who was not in fact guilty.     Every offense must first be reported upon by this body before the party can be tried.     On what principle ,there should be trammels placed upon the free action of such a body in obtaining witnesses by whom violations of law can be shown and brought to punishment, I have never been able to see.     I would give them this power in all cases where they had reason to suspect crime, and fix upon this body the *duty* to investigate.     The opposite view must rest on the idea that for some cause it is important in many cases that crime shall have as much shelter as possible, and only be punished when private vengeance shall prompt a prosecutor to undertake to represent public justice, and the few other cases provided for by our law.     In a government organized on the theory that law is to be supreme, and give protection to the community; and this protection given by ·enforcement of its penalties, it seems to me all the agencies of that law should be given all power that will increase their capacity to attain the end for which such agencies ·exist.     To inquire through sworn witnesses is an agency efficient for this purpose, and the Legislature have seen this, and applied it in cases that otherwise had grown difficult of detection, as gaming for instance.     Why not in all cases where law is violated.     I confess I am unable to see a reason for a contrary view.

But the radical error that underlies all this question is, that it is assumed the citizen is to be protected in this case from unauthorized prosecutions, as I have shown he has ample protection, if in fact the grand

jury exercise unauthorized power. The question is not whether the citizen shall be indicted improperly under the inquisitorial power of the grand jury, but whether a witness shall be permitted to defy the authority of the court, and refuse to answer questions propounded, on the plea that the subpœna under which he was summoned was not regularly issued, the process being regular on its face, representing the authority of the court, and to him a complete protection for his action under it. In a word, the question is whether the witness shall be permitted to shield his friends from criminal prosecution by interposing as an after thought a mere technicality as to the regularity of the summons by which he was commanded to appear. I hold that the subpœna had served its purpose when he was brought before the grand jury in obedience to it, and had been sworn. The only question is, was that body in the exercise of its proper authority? Had it the right to inquire of violations of the gaming laws? If so, the party was bound to answer, and it was no matter of concern to him whether the subpœna commanding him to appear was irregularly issued or not. He had passed the point where such an objection could be made, and by being sworn had submitted himself to the jurisdiction, and was bound to obey the orders of the court as a witness.

This is common sense, and the practical view of the question—can do no one any wrong who is innocent, and the guilty deserve to be punished—the opposite view shields the offender from discovery, gives protection and immunity to crime, and lowers the dig-

nity of the judiciary.   So that it can be defied by any one who chooses, and escape punishment on a mere technicality, as I think, and unsustained either on principle or a sound public policy.

The result of holding that an appeal will lie in such a case practically renders the inquisitorial power of the grand jury in gaming cases entirely powerless. A witness has only to refuse to answer the questions, and appeal to this court.   His friends who are involved will generally pay the expenses of the appeal. By the time the case is decided here in the larger proportion of cases, the statute of limitations will have run, and the violators of law be free from danger, and so escape—criminals will be shielded, but the courts go down in the dust under this ruling.   I add, the only true principle on the question of the right of the witness to object to the regularity of the subpœna is, that when he has responded to it, and been sworn, it is equivalent to entering his appearance, and submitting to the jurisdiction of the court.   He must then answer all legal questions put to him.   This is in accord with all the analogies of our law, and the only practical rule in such cases.   For these reasons we dissent most earnestly from the conclusions of the majority in this case.

COOPER, J., concurs.