LOUIS LAFONTAINE. v. SOUTHERN UNDERWRITERS ASSO-
CIATION.

*Supplementary Proceedings— Contempt— Questions incriminat-
ing Witness—Refusal to Answer.*

1. When in the course of proceedings supplementary to execution a witness is examined by a referee under section 268 of the code, no *trial* can be said to take place before the referee, and a contempt in refusing

to answer questions on such examination must be punished by the court making the reference.

2. The essential and inherent common law power of the courts to punish as a contempt the refusal of a witness to answer proper questions is expressly confirmed by Battle's Revisal, ch. 24, § 7 (4).

3. Where a witness refuses to answer a question on the ground that such answer will tend to convict him of a crime, it is the province of the court to determine whether a direct response to the question will have that tendency.

4. Since by the provisions of section 264 (5) of the code the answer of one examined under proceedings supplementary to execution cannot be used against him in any criminal proceeding or prosecution, a witness called to testify on such an examination as to his dealings in behalf of a defunct corporation of which he was an officer cannot excuse himself on the ground that the evidence thus elicited might be used on the trial of indictments pending against him and others, for conspiring to cheat and defraud divers persons in the management of the affairs of such corporation.

5. *Semble*, that if the witness himself states his belief that such indictments are prosecuted solely for black-mailing purposes, as to which he could only thus speak on the supposition of his entire innocence, no truthful answer of his could have any possible tendency to convict him of crime.

(*Puin* v. *Pain*, 80 N. C., 322, cited and approved.)

Rule upon a witness to show cause why he should not be attached for contempt in refusing to answer certain questions, heard at January Special Term, 1880, of Wake Superior Court, before *Avery, J.*

This was a proceeding supplementary to execution, and on the 10th of April, 1878, an order was made by the judge of the superior court, requiring George W. Blacknall, the treasurer and managing agent of the defendant association, to appear before a referee who was appointed to take and certify the examination of said Blacknall and such other witnesses as may be brought before him, to make discovery concerning the property and effects of the defendant. And it was further ordered that the referee be vested with such

powers in the conduct of the examination as are conferred upon him by law. After due notice, the said Blacknall appeared before the referee, and was sworn and examined as a witness. He declined to answer the questions set out in the opinion of this court, and for the reasons therein stated. The referee ruled that the questions (except one) were proper, but that he had no power to compel the witness to answer, and certified the same to the court to the end that the witness may be dealt with touching his refusal to answer. And upon motion before *Eure, J.*, at June term, 1879, the witness was ordered to show cause why he should not be attached for contempt. In answer to the rule, the witness stated in his affidavit, in substance, that his refusal to answer was based solely on the ground of his privilege as a witness, that is, that he could not be compelled to give evidence which might tend to self-crimination. The hearing of the matters set forth in the answer to the rule was continued until January term, 1880, when the plaintiff's counsel moved to make the rule absolute and declare the witness in contempt. His Honor held that the witness should be compelled to answer the question in reference to the possession of the books of the defendant association, and how he had disposed of the same, and also that he should answer question No. 8, in reference to the existence of any assets of the association, and that he was not compelled to answer the other questions. The referee was ordered to proceed with the examination, and the witness to appear on Wednesday of the next term and show that he had obeyed the order of the court, or show cause why he should not be attached for contempt. From this ruling the plaintiff appealed.

*Messrs. Hinsdale & Devereux* and *A. W. Haywood*, for plaintiff.

*Messrs. Merrimon, Fuller & Fuller* and *R. C. Badger*, for defendant.

LaFontaine v. Southern Underwriters.

Smith, C. J. In executing the order under which the referee is directed "to take and certify the examination of George W. Blacknall and such other witnesses as may be required to appear before him" to make discovery and to examine concerning the property and rights of the said defendant, certain interrogatories were propounded to the witness named, which he declined to answer. These interrogatories, numbered consecutively from 2 to 22 inclusive, omitting those numbered 3 and 4 as not material, are as follows:

2nd question. "Have you the books mentioned in the subpoena and belonging to the Southern Underwriters' Association in your possession?" The witness answers "I have been indicted with two other persons in the superior courts of Bertie and Cumberland counties, N. C., for conspiring to cheat and defraud, which indictments are founded on an alleged connection and management of the business and affairs of the Southern Underwriters' Association, the defendant herein. These indictments are still pending. I believe they are and were prosecuted for the purpose of black-mailing. But as they are still pending, I object and decline to answer the question asked me, on the ground that such answer might tend to criminate me." The referee required this question to be answered.

5th question. "Have you ever had possession of the books referred to?"

6th. "Do you know who now have them in possession; if so, who?"

7th. "When and where did you last see them?"

8th. "Do you know of the existence of any assets of the Southern Underwriters' Association?"

9th. "Did the S. U. Association ever own any U. S. bonds; if so, what has become of them?"

10th. "Did the S. U. Association ever own any North

Carolina R. R. bonds, or any county or city bonds; if so, where are they now ? "

11th. " Has the S. U. Association ever owned any mortgages upon real estate in North Carolina, if so, please give me an account of the same ? "

12th. " In whose names were the mortgages taken, if any ? "

13th. " What disposition has the company aforesaid made of these mortgages, if it ever had any ? "

14th. Were you ever treasurer of this company ? " Ruled out.

15th. " Did these bonds or any of them, or any of the securities referred to, come into your hands as treasurer of said company, or at all since the organization of the company ? "

16th. " Have you been treasurer at any time since the organization of the S. U. Association, of that company ? "

17th. " If the S. U. Association has at any time since its organization been in possession of any United States bonds, from whom did it obtain them, when and upon what terms ? "

18th. Were any United States bonds and other securities exhibited to the secretary of state of North Carolina at any time since the organization of the company as the property of the company; if so, when, where, what bonds and securities, from whom obtained, upon what terms, and where are they now ? "

19th. " Were you one of the original subscribers to the company; if so, how much stock did you take, and did you pay it up ?"

20th. " If you paid your subscription, how did you pay ?"

21st. " Do you know where the cash account was kept; if so, where ?"

22d. " Do you mean to swear that it might criminate you

to tell where the company kept their cash account?" Ruled out, no answer.

To all these questions the witness replied in substance: "I decline to answer upon the ground that it might criminate me."

The referee reported the refusal of the witness to the court, and thereupon His Honor decided that the witness should answer questions numbered two and eight, and should be excused from answering the others, for the reasons assigned by him. From this ruling the plaintiff appeals to this court, and its correctness is the only reviewable matter presented for our consideration.

1. It is insisted on behalf of the witness that his contumacy can be corrected and controlled only by the referee, and that the court has no cognizance thereof: The referee has power to enforce obedience to his rulings, on the trial of the issues before him, just as the court would have upon the trial before it by virtue of the express provisions of C. C. P., § 246. But this is not a trial, and the scope and purpose of the reference is alone the collection of the evidence and the relief of the court from the delay and trouble of taking it, and in such cases the authorities cited are decisive of the regularity of the course here taken. Ed. Ref., 40; *Forbes* v. *Willard*, 37 How. Prac. Rep., 193; *Lathrop* v. *Clapp*, 40 N. Y., 328.

2. It is again objected that an attachment for disobedience of an order of the court is not authorized by the act of 1869. Bat. Rev., ch. 24. The power is expressly conferred upon every court of record by par. 4, § 7, which declares that such court shall have power to punish for contempt "all persons summoned as witnesses in refusing or neglecting to obey such summons to attend, to swear, or *answer as such witness.*" It is moreover an essential attribute of a court to enforce by proper process its own lawful orders, and without this power

its essential functions would be paralyzed or destroyed, as was said in *Pain* v. *Pain*, 80 N. C., 322 ; C. C. P., § 274.

These objections being removed, we are now brought to the consideration of the question as to the obligation of the witness, and his right to refuse to answer the enquiries because, as he states, it may tend to criminate himself.

The proceeding against the defendant is to ascertain if it has assets, where they are and in what they consist, with a view to subject them to the plaintiff's judgment, and the information is refused on the ground that the witness is charged with a conspiracy with others, in fraudulently disposing of the assets. The plaintiff has a clear legal right to all the evidence tending to elucidate the enquiry and aid him in subjecting the property of his debtor to the satisfaction of his claims, and the refusal is only admissible when the disclosure of the witness tends to prove his connection with crime and contravenes the immunity guaranteed in the constitution, Art. I, § 11.

In all criminal prosecutions every man has the right to be informed of the accusation against him, &c., " and shall not be compelled to give evidence against himself." The fair interpretation of this clause seems to be to secure one who is or may be accused of crime, from making any compulsory revelations which may be given in evidence against him on his trial for the offence.

So it is held, that if he has been tried or has been pardoned, or the prosecution is barred by the lapse of time, so that he is no longer exposed to a prosecution, he cannot ask to be protected from making a disclosure material to the pending investigation. In such case the evidence can never be used against him, because he can never be put on trial, and never incur any peril thereby. 1 Whar. Cr. Law, § 808.

While it is extremely difficult to discriminate the cases where the witness may and may not be compelled to testify,

there is a general concurrence of the authorities that the matter is not left to the decision exclusively of the witness. The court must, in the first instance, determine whether the question is such that it may be reasonably inferred that the answer may be self-criminating, and the nature of the answer, necessarily known to the witness alone, he alone must decide. If the information sought may be self-accusing and the witness says it is, he need not answer.

In the trial of Burr, Chief Justice Marshall lays down the rule, which most of the text writers adopt, as the correct, practical rule, in these words: " It is the province of the court to judge whether any direct answer to the question that may be proposed will furnish evidence against the witness. If such answer may disclose a fact, which forms a necessary and essential link in the chain of testimony which would be sufficient to convict him of any crime, he is not bound to answer it, so as to furnish matter for that conviction. In such case the witness must himself judge what his answer will be, and if he says on his oath he cannot answer without accusing himself, he cannot be compelled to answer."

" Whether it (the answer) may tend to criminate or expose the witness, is a point which the court will determine under all the circumstances of the case." 1 Greenl. Ev., § 451. And the same view is taken in Ros. Cr. Ev., and in other authorities.

The principle is very accurately stated by the court in *People* v. *Mather,* 4 Wend., 299, thus: " My conclusion is that when a witness claims to be excused from answering because his answer will have a tendency to implicate him in a crime or misdemeanor, or will expose him to a penalty or forfeiture, then the court are to determine whether the answer he may give to the question can criminate him directly or indirectly, by furnishing direct evidence óf his guilt or by establishing one of many facts which together

may constitute a chain of testimony sufficient to warrant his conviction, but which one fact could not of itself produce that result." A very elaborate opinion is given by the court in _Ward_ v. _State_, 2 Mo., which is largely extracted and set out in a note to 1 Whar. Cr. Law, § 807.

There, a witness before the grand jury was asked in these words: "Tell who bet at the game of faro, not naming yourself." This game is played with cards by one person as banker against any number of persons, each playing for himself without any common interest among them. The question was held proper and the witness required to answer it.

In the opinion the court say: "The rule then is that the court must judge whether a direct answer would furnish matter for his conviction. If the witness answer that he saw no one bet, or that he saw B and C bet, he furnishes no matter that would be a necessary link in the chain of testimony to convict him of betting at faro." * * Let us put a case where a direct answer to a question would implicate a witness. Thus, did you set up and keep a faro table? Now, here the court can clearly see that if the answer be "yes," the witness would subject himself to the penalties for setting up and keeping a faro table, and if the answer be "no," he cannot so subject himself. But whether the answer be "yes" or "no" is unknown to the court, and in this case the witness must be the judge whether his answer will be yes or no, and he may say he cannot answer the question without criminating himself."

So COCKBURN, C. J., says: "It was contended that a bare possibility of legal peril was sufficient to entitle a witness to protection; nay, further, that the witness was the sole judge as to whether his evidence would bring him into danger of the law and that the statement of his belief to that effect, if not manifestly made _mala fide_, should be received as conclu-

sive.   With the latter of these propositions, we are altogether unable to agree."

Upon a review of the authorities, we are clearly of opinion that the view of the law propounded by Lord Wensleydale, 10 Ex., 701, in *Osborn* v. *The London Dock Co.*, and acted upon by Vice Chancellor Stuart in. *Side-bottom* v. *Adkins*, 3 Jurist. N. S., 631, 632, is the correct one; and that to entitle a party called as a witness to the privilege of silence, the court must see from the circumstances of the case and the nature of the evidence which the witness is called to give, that there is no reasonable ground to apprehend danger to the witness from his being compelled to answer."   Best. Ev., 125; *Forbes* v. *Willard*, 37 How.. Pr. Rep., 193.

But it is contended that a disclosure of the names of persons present engaged in the criminal acts, may furnish the means of procuring testimony to show the witness' own criminal participation, and thus to be made to give evidence or the means of obtaining evidence equivalent in effect to prove his own guilt.   The learned opinion of the supreme court of Missouri meets this aspect of the question also and we again quote from it :.

" But it is said the witness is bound to tell who bet at the game, without naming himself, when those persons who are named will be examined as to the fact whether he bet, and if the witness is not compelled to name who did bet, then they will remain unknown to the grand jury and cannot be examined whether the witness bet.   I understand this doctrine to be grounded more on the fear of retaliation than on any sound principle of law.   Will the law permit a man to keep offences and offenders a secret, lest the offenders should, in their turn, give evidence against him ?   I have looked into the cases cited at the bar and am unable to perceive any principle which ought to vary the foregoing opinion."

It is quite obvious from the principle established that much of the information responsive to the questions, and especially such as does not involve any alleged fraudulent appropriation of the debtor's property, to which the witness may have been privy, the plaintiff is entitled to have. But it is unnecessary to separate that which may not from that which may be withheld, as imputing criminality to the witness, since we are clearly of opinion that as he is protected from the consequences of the discovery and the facts elicited can be given in evidence in no criminal prosecution to which they are pertinent, the plaintiff is entitled to full answer and to all the information which he possesses; and this whether it does or does not implicate himself in the fraudulent transaction. In this we are fortified by decisions upon the same statute *mutatis mutandis* of the court of the state of New York, from which ours is derived. "Whenever the party or witness interrogated," says Daniel, J., in *Forbes* v. *Willard, supra,* "may have committed a fraud, whether solely or united and combined with others, it is still a fraud within the intent and meaning of the language used in this section, and the necessary disclosure of it by the answer required to be given in the course of the examination for the discovery of the debtor's property, constitutes no legal justification for the party or witness, who on that account refuses or declines to answer the questions propounded to him for that purpose."   *   *   "Neither the debtor nor any witness produced by him or the creditor is at liberty to shield himself from answering, because the answer required will lead to that disclosure." 38 How. Pr. R., 193.

Again, in considering the very section of the code now under examination in *Lathrop* v. *Clapp,* 40 N. Y., 328, the court of appeals say: "The object of this act was to give a judgment creditor, who had been unable to collect his debt by ordinary process of law, a relief in this summary way to

discover his debtor's property, if any he have.    This right of discovery was intended to be made full and complete, as is apparent from subsequent portions of the act.    The section declares that on examination under this section either party may examine witnesses in his behalf, and the judg- ment debtor may be examined in the same manner as any other witness.    And if there is any force in language, the legislature have intimated in clear and unmistakable terms this examination was not intended to be restricted as here claimed, but that the fullest scope was intended to be given to ferret out fraudulent transfers of property.    Else why did they close up this section by "that no person shall, on ex- amination pursuant to this chapter, be excused from an- swering any question on the ground that his examination will tend to convict of the commission of a fraud, but his answer shall not be used as evidence against him in any criminal proceeding or prosecution."

It is clear that the act contemplates a thorough and searching examination into all fraudulent dispositions of property made to defeat creditors and does not allow the enquiry to be evaded upon any ground of the self-crimina- ting answer which may follow.    It must be answered, what- ever its bearing upon the witness and however strongly tending to show his fraudulent conduct, because this is nec- essary to the creditors' relief, and fraud finds no favor in the law.    But the answers of the witness cannot be used against him in any criminal proceeding whatever, and his constitu- tional right not to "be compelled to give evidence against himself" is maintained intact and full.

How can this immunity be invaded by requiring disclos- ures, rendered inadmissible as evidence against him, and when any attempt by subsequent legislation to make the evidence competent would be an *ex post facto* enactment and in conflict with the constitution of the United States?

It is not inappropriate before concluding this discussion

to advert to the fact that the witness characterizes the prosecutions as black-mailing attempts to extort money, of which he could only thus speak upon the supposition of his innocence of the charge preferred, and if he is innocent, it is difficult to understand how any truthful disclosure could harm him or tend to his conviction of crime.

We are therefore of the opinion that the witness must answer the questions, and he cannot shield himself behind his declaration that they involve self crimination. The ruling below is erroneous and is reversed. This will be certified.

Error.                                                    Reversed.