IN RE BRIGGS.

(Filed April 19, 1904).

CONTEMPT—*Witnesses—Const. U. S., Fifth Amendment—The Code, sec. 1215—Const. N. C., Art. I, sec. 11—Gaming—Pardons.*

The Code, sec. 1115, requiring a witness to testify touching any unlawful gaming done by himself or others, is not unconstitutional by reason of the fifth amendment to the constitution of the United States or Art. I, sec. 11, of the constitution of North Carolina, for the reason that the said statute grants a pardon to the witness.

IN THE matter of R. G. Briggs, heard by *Judge Frederick Moore,* at September Term, 1903, of the Superior Court of WILSON County.

This is an appeal from a judgment for contempt from *Moore, J.,* at February Term, 1904, Wilson Superior Court. In the case of *State v. George Morgan,* who was indicted for

keeping a gaming house, with a second count for playing cards for money in violation of chapter 29, Laws 1891, R. G. Briggs was sworn as a witness for the State. The Solicitor asked the witness: "1. Have you been in the defendant's room on the west side of Goldsboro street, in Wilson, N. C., within the last two years?" The witness stated that he declined to answer the question, on the ground that his answer might tend to criminate him. Before the witness finally declined to answer this question, the Solicitor asked him the following additional questions: 2. "Describe the room." 3. "Have you within the last two years seen a game of cards played in the defendant's room for money or other thing of value in which you did not participate?" 4. "Have you within the last two years seen a game of cards played in the defendant's room for money or other thing of value in which you did participate?" The witness declined to answer each and every of these questions for the reason first given. The Court being of opinion that under section 1215 of The Code the witness is not privileged from answering the questions and all pertinent questions relating to the charge against the defendant, but should be compelled to answer, informed the witness that he must answer the questions. The witness again declined to answer. Whereupon the Court adjudged the witness guilty of a contempt of Court and imposed a fine upon him and ordered him in custody of the Sheriff until the fine was paid. The witness excepted and appealed.

*Robert D. Gilmer, Attorney-General,* for the State.
*John E. Woodard,* for the respondent.

CLARK, C. J. Section 648 of The Code provides that "any person guilty of any of the following acts may be punished for contempt: 6. The contumacious and unlawful refu-

sal of any person to be sworn as a witness, or, when so sworn, the like refusal to answer any legal and proper interrogatory."

The fourth question was, "Have you within the last two years seen a game of cards played in the defendant's room for money or other thing of value in which you did participate?" As already stated, the witness declined to answer, on the ground that his reply would tend to criminate him. The Court being of opinion that under The Code, section 1215, the witness was not privileged from answering this or any other pertinent questions relative to the charge against the defendant, directed the witness to answer, and upon his refusal adjudged him in contempt and imposed a fine and ordered him into custody until it was paid, from which judgment and order the respondent appealed.

The Code, section 1215, is as follows: "No person shall be excused on any prosecution from testifying touching any unlawful gaming done by himself or others; but no discovery made by the witness upon such examination shall be used against him in any penal or criminal prosecution, and he shall be altogether pardoned of the offense so done or participated in by him." The respondent contends that this statute is unconstitutional, in that,

(1) It violates the Fifth Amendment to the Constitution of the United States, which provides that "no person * * * shall be compelled in any criminal case to be a witness against himself."

We have already at this term, in *State v. Patterson*, 134 N. C., 612, called attention to the well-known historical fact that the first ten amendments were passed as restrictions solely upon the Federal Government and courts, and that the United States Supreme Court has uniformly held that they do not apply to the State governments or courts. In *Barron v. Baltimore*, 32 U. S., 243, *Marshall, C. J.*, refer-

*In re* BRIGGS.

ring to the first eleven amendments, said: "These amend
ments contain no expression indicating an intention to apply
them to the State governments. This Court cannot so apply
them." This, repeatedly and uniformly, has been so held
by that Court ever since, and among the cases are *Peryear v.
Comrs.,* 72 U. S., 480; *Twitchell v. Comrs.,* 74 U. S., 325;
*U. S. v. Cruikshanks,* 92 U. S., 552; *Presser v. Ill.,* 116
U. S., 265; *Spies v. Ill.,* 123 U. S., 166, in which it is said
that it is well settled that the first ten amendments to the
Federal Constitution were not intended to limit the powers
of the States. *Hollinger v. Davis,* 146 U. S., 319, and
numerous other Federal and State decisions collected in 3
Rose's Notes to the U. S. Reports, 368—372, and 6 *Ibid.,*
986, 987.

2. That the statute (section 1215) violates Article I, sec-
tion 11, of the Constitution of North Carolina, which
declares that no person shall "be compelled to give evidence
against himself." The same point of alleged unconstitution-
ality has been repeatedly presented in State and Federal
courts as to similar statutes, and the ruling has generally been
that even where the statute merely provides that the evidence
elicited from the witness cannot be used against him, he
can be required to testify. *State v. Quarles,* 13 Ark., 307;
*Wilkins v. Malone,* 14 Ind., 153; *Ex-parte Buskett,* 106
Mo., 602, 14 L. R. A., 407, 27 Am. St. Rep., 378, and
cases therein cited; *Kneeland v. State,* 62 Ga., 395; *People
v. Kelly,* 24 N. Y., 74.

There are cases which hold that he cannot be required
to testify unless total immunity is guaranteed him, because
clues may be discovered by the evidence which may be fol-
lowed up to the prisoner's subsequent conviction without
putting in evidence his declarations made when a witness.
*Smith v. Smith,* 116 N. C., 387; Emery's case, 107 Mass.,
172, 9 Am. Rep., 22. But when, as in our State, the statute

provides that the witness in such case shall have absolute immunity from punishment in regard to his participation in the offense as to which he has been required to testify, the rule is universal that he may be compelled to testify. Among the cases clearly stating this are *Hirsch v. State,* 67 Tenn., 89; *Warner v. State,* 81 Tenn., 52; *State v. Nowell,* 58 N. H., 314; *People v. Foundry* (1903), 201 Ill., 236. In our own State the point here presented was decided and the witness was required to answer in *La Fontaine v. Underwriters,* 83 N. C., 132, and *State v. Morgan,* 133 N. C., 743, in which last it is said that the witness "was properly made to answer the questions. The Code, section 1215." This was said as to another witness in this same case.

Though the Fifth Amendment to the United States Constitution does not apply to the State courts, that amendment is so nearly in the words of the similar provision in the State Constitution that the above distinction cannot be more clearly indicated than by reference to two well-known decisions of the United States Supreme Court. In *Counselman v. Hitchcock,* 142 U. S., 457, the protective statute (U. S. Rev. Stats., 860) was merely that "no evidence given by the witness shall be in any manner used against him in any court of the United States in any criminal proceeding," and it was held that the witness was not compelled to answer, for the statute fell short of the constitutional provision in that the disclosure of the circumstances, sources and means of the offense might be used effectually in a subsequent prosecution against the witness for his participation in that very offense, without using his answers on the witness stand as evidence against him on his trial. That case cites (p. 579) the decision in *La Fontaine v. Underwriters,* 83 N. C., 132, as based upon a statute (The Code, section 1215) giving such full and complete protection that the witness could properly be required to testify.

In *Brown v. Walker,* 161 U. S., 591, Congress had, under the intimation in *Counselman v. Hitchcock, supra,* amended the law by chapter 83 (1893), 27 St., 443, which provided that the witness required to testify in the cases designated should not "be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matters or things, concerning which he may testify." This was held to give absolute immunity against prosecution for the offense to which the questions related and deprived the witness of his constitutional right to refuse to answer. The Court said (p. 595) that if this were not so, "the practical result would be that no one could be compelled to testify to a material fact in a criminal case, unless he chose to do so, or unless it was entirely clear that the privilege was not set up in good faith." The Court cites authorities (pp. 598, 599) that if prosecution would be barred as to the witness by the statute of limitation or a pardon he would not be privileged to refuse to answer, and says this statute gives him the same protection and deprives him of the privilege which he no longer requires for his protection.

Our statute, The Code, section 1215, is more explicit than the Federal statute passed upon in *Brown v. Walker, supra.* It provides that the evidence adduced shall not be used against the witness "in any penal or criminal prosecution, and he shall be *altogether pardoned of the offense so done* or *participated in by him."* In *State v. Blalock,* 61 N. C., 242, this Court sustained an act of the Legislature granting "amnesty and pardon," and speaks of "special pardons" and general pardons by legislative act. In *State v. Keith,* 63 N. C., at page 143, the Court recognizes again the validity of a pardon by legislative enactment, citing 4 Blk., 401, and *Marshall, C. J.,* in *U. S. v. Wilson,* 32 U. S., 163, who state that the courts must take judicial notice of a pardon by act of Parliament because it is considered a pub-

*In re* BRIGGS.

lic law, having the same effect as if the general law punishing the offense had been repealed on amended. It was evidently held in *State v. Blalock,* and *State v. Keith, supra,* that Article III, section 6, of the Constitution, conferring on the Governor the power to grant reprieves, commutations and pardons, after conviction, for all offenses (except in cases of impeachment) "was not the grant of an exclusive power and did not deprive the General Assembly of the power to pass special or general acts of pardon, like the English Parliament, even before conviction." The same view is expressed in *Brown v. Walker,* 161 U. S., at page 601, which holds that a similar act of Congress "securing to witnesses immunity from prosecution is virtually an act of general amnesty and within the power of Congress, although the Constitution vests in the President 'power to grant reprieves and pardons for offenses against the United States, except in cases of impeachment.' " The Court further says, citing *Knot v. U. S.,* 95 U. S., 152, that the distinction between amnesty and pardon is of no practical importance, and that the decisions in this country and in England, as to the legislative power to grant pardons, with one or two exceptions in this country, are unanimous in favor of their constitutionality.

The witness was properly required to answer.

Whether the ruling below on the facts of this case should be presented for review by *habeas corpus* or by appeal is a question not raised by any exception and we do not think we should discuss the point *ex mero motu.*

The judgment below is affirmed.


DOUGLAS, J., concurring. I am *in limine* with the vital question as to the defendant's right of appeal. If he has no right of appeal it makes no difference what questions might be decided if the appeal were entertained. Under the facts

of this case and the principles of law applicable thereto, I think the defendant has a right of appeal.

In fact, under all the circumstances, we think this the proper and most convenient proceeding in the case at bar. It is true the defendant, properly so called as this is a criminal prosecution, might sue out a writ of *habeas corpus,* but this course might be liable to grave inconveniences. One Judge of the Superior Court might feel great hesitation in annulling the judgment of another Judge, especially in a matter so nearly affecting the integrity of the Court. If the writ were issued by a member of this Court returnable before himself the same hesitation might exist, though perhaps to a less degree; while to make the writ returnable before a full bench would be too cumbersome to ensure prompt and adequate relief, as is hereinafter shown. A writ of *certiorari* might be equally inadequate. Much stress is laid upon the delay resulting from an appeal. A writ of *certiorari* would, and a writ of *habeas corpus* might, cause the same delay. It should be borne in mind that the defendant appeals at his peril. If this Court affirms the judgment of the Court below his sentence will remain in full force and effect. In any event, I think he is entitled to prosecute his appeal, and the fact that it will avail him nothing is no legal reason for its denial.

The Constitution (Article IV, section 8) says that "The Supreme Court shall have jurisdiction to review, upon appeal, *any* decision of the Courts below, *upon any matter of law or legal inference,* * * * and the Court shall have the power to issue any remedial writs necessary to give it a general supervision and control over the proceedings of the inferior courts." Section 945 of The Code is in the exact words of the said section of the Constitution. As far as I can see, no distinction is made either in the Constitution or the statute as to cases of contempt. "Any matter of law

or legal inference" are terms of most direct and comprehensive meaning, and, if they mean anything, mean what they say.

It must follow that in all cases of contempt where any question of law is involved, the defendant, for such he becomes when attached for contempt, is entitled to an appeal to this Court. The only possible ground upon which he can be denied an appeal is that of absolute necessity, and it is clear that such a principle can never extend beyond the necessity that alone brought it into existence. *Necessitas non habet legem,* or as it is perhaps more properly stated, *necessitas vincit legem,* is a maxim which, however beneficial in some cases, is in its ultimate tendency destructive of all law and therefore should be rarely invoked. I am not partial to maxims which tend to abridge the liberty of the citizen or to deprive him of the equal protection of the law.

I am aware of the distinction attempted to be made in some jurisdictions between civil and criminal contempts, but I must confess that this classification is by no means clear, and has not always been rendered clearer by the learning of the books. Learning is not always wisdom. I am also aware of the distinction created in this State between *contempt* and *as for contempt,* and the decisions of this Court that in the latter class of cases an appeal will lie, while it will not in the former. This ruling, which has no foundation in the statute, arises purely *ex necessitate,* and is based upon the inherent right of self-defense attaching to the Court as well as to the individual. Therefore the power of summary punishment can never exceed the limits of the necessity, and in dealing with the liberty of the citizen this necessity must be actual and not constructive. The individual has inherent rights as well as the Court, and it was primarily for the protection of those rights that Courts themselves were instituted. The old idea that the individual

*In re* BRIGGS.

is a mere atom of the State, having no rights except those that have been granted to him by the sovereign, has no application in this country. Here the State is the creature of the citizen, who holds his personal rights inherently and inalienably.

We will freely admit that if the conduct constituting the contempt is such as to actually obstruct the business of 'the Court, as in Mott's case, no appeal would lie, as the consequent delay would prevent the prompt action rendered absolutely necessary for the protection of the Court. But where a man creates no disturbance whatever, and is guilty of no act which can be construed into contempt beyond a respectful insistence upon a constitutional right, he is in our opinion entitled to an appeal by every just principle of law. What other protection can he have? It has been suggested that he might obtain a writ of *"habeas corpus* issued probably by one member of this Court before the full bench." I am not aware of any such provision of law; but suppose it were so, would it give him an adequate remedy? He would be compelled to go to jail until he could reach a member of this Court, and remain in jail until the next term of this Court if it were not then in session. Was it ever contemplated that the great prerogative writ of *habeas corpus* should be disposed of in any such manner? What good would it do the defendant if his petition were not heard until after the expiration of his term of imprisonment? So far I have relied upon the reason of the thing. "Reason," says Coke, "is the soul of the law; the reason of law being changed, the law is also changed." We think, however, that an examination of the statutes and the decisions of this Court will show that in this case reason and authority point to the same conclusion.

The contention of the State seems to be based entirely upon section 648 of The Code, apparently ignoring section

654, which provides that courts "shall have power to punish *as* for contempt (4) all persons summoned as witnesses in refusing or neglecting to obey such summons to attend, be sworn or *answer* as such witness." Such refusal comes under section 648 only when it is "the ·contumacious and *unlawful* refusal to answer any *legal* and *proper* interrogatory." To make a person guilty of contempt under that section, the question must be both legal and proper, and the answer both unlawful and contumacious. Admitting that the questions were all proper, and the defendant's refusal to answer consequently unlawful, there is no evidence whatever that such refusal was contumacious. The Court below evidently did not consider it so, because it fined the defendant one dollar. It is true that the provision of section 650 that "the Court shall cause the particulars of the offense to be specified on the record," does not of itself give to the defendant the right of appeal; but it does give to this Court the means of ascertaining whether or not the appeal was properly taken. It is evident that any refusal of a witness to answer must necessarily be in the immediate presence of the Court, and yet when not contumacious it is punishable only *as* for contempt under section 654. The refusal of the witness to answer did not in any way tend to disturb the proceedings of the Court, or even necessarily cause a continuance of the case, as the State might have proceeded without his testimony. At most, it could only have caused such delay as results from any other appeal. He could cause the same delay by going to jail and applying for a writ of *habeas corpus,* as suggested in the contentions of the State; or he could cut the gordian knot by failing to attend. In the latter event he could be punished only *as* for contempt with the admitted right of appeal. I am assuming that the witness *unlawfully* refused to answer. If his refusal had been lawful and proper, then no power on earth should compel

*In re* BRIGGS.

him to answer. In *In re Bonner,* 151 U. S., 242, the Supreme Court of the United States has well said that "The law of our country takes care, or should take care, that not the weight of a judge's finger shall fall upon any one except as specifically authorized.

A brief review of the cases relied upon by the State I think will sustain the view I entertain in this case. In *State v. Woodfin,* 27 N. C., 199, 42 Am. Dec., 161; *State v. Mott,* 49 N. C., 449, and *Ex-parte Summers,* 27 N. C., 149, the offenses were committed *in facie curiæ,* the two former being fights, and the last a positive refusal in contemptuous language to return process after the direct order of the Court. *Scott v. Fishblate,* 117 N. C., 265, 30 L. R. A., 696, was a civil action for damages and did not involve the right of appeal. In the cases of *In re Daves,* 81 N. C., 72; *In re Deaton,* 105 N. C., 59; *State v. Aiken,* 113 N. C., 651, and *In re Robinson,* 117 N. C., 533, 53 Am. St. Rep., 596, the appeal was entertained and the judgment of the Court below was reversed and set aside. *In re Gorham,* 129 N. C., 481, the judgment was specifically affirmed. *In re Daves,* 81 N. C., 72, this Court says, on page 75 : "The plaintiff insists that an appeal does not lie from a judgment imposing a penalty for contempt. This is true as to that class of contempts which are committed in the presence of the Court, or so near as to interfere with its business, and the reasons for which are justly set out by *Nash, C. J.,* in the opinion in *State v. Mott,* 49 N. C., 449. But in cases like the present, where the right to punish depends upon a 'willful disobedience' of 'any process or order lawfully issued,' the lawfulness of the power exercised is a proper subject of review in this Court." Why does not this decision apply to the case at bar, where the right to punish for contempt under section 648 depends upon the "contumacious and unlawful" refusal of the witness to answer any "legal and proper interroga-

tory ?" The State in the case at bar, as the Court has done in some cases, lays great stress upon the reasons given by *Nash, C. J.,* in *State v. Mott.* What are those reasons? This Court has well said in *Walton v. Gatlin,* 60 N. C., 310: "When the stream becomes too muddy to see the bottom the surest way to find truth is to go up to the fountain head, that is, 'to the reason and sense of the thing.' " In Mott's case *Nash, C. J.,* speaking for the Court, says (49 N. C., page 50) : "For good reasons the law does not authorize an appeal in such cases. To constitute a contempt the act done must be in the presence of the Court, or so near thereto as to obstruct the administration of justice. From the nature of the offense it is difficult to see how another Judge can estimate the nature of the act. The evil requires prompt action to its removal. Let us suppose a case: A man comes into court and by his noisy behavior obstructs the business; the Judge orders him to be fined and imprisoned for the contempt; the delinquent appeals to the Court above; the appeal of course annuls the judgment; but the individual remains in the court-house and still continues his disorderly conduct; the Court again interferes by a judgment of fine and imprisonment, and again the right of appeal is interposed, and so on, as long as the obstinacy and folly of the trespasser continues, to the entire suspension of the public business and in utter contempt of the judicial authority." Do any of these reasons apply to the case at bar? If not, then why should we follow the decision in that case as an authority?

I come now to a consideration of the case upon its merits, and we find no difficulty in arriving at a conclusion. I do not see how the first question could tend to criminate the witness, and we might place our affirmance of the judgment upon his failure to answer it alone; but as he was asked all the questions at the same time, and the action of the Court below is founded upon his refusal to answer all

*In re* BRIGGS.

the questions, I deem it proper to consider them. Indeed, it would seem that the propriety of the last question is the real matter sought to be determined in this appeal. It certainly presents its most important phase.

I think that all the questions should have been answered by the witness, including the one involving his own participation, although it does not appear that the Court informed him of the protection afforded by the statute as clearly as perhaps he should have done.

The Constitution of this State, in section 11 of Article I, provides that: "In all criminal prosecutions every man has the right to be informed of the accusation against him, * * * and not be compelled to give evidence against himself."

The scope of this protection is explained by this Court in *Smith v. Smith,* 116 N. C., 386, as follows: "We think the provisions of our Constitution ought to be liberally construed to preserve personal rights and to protect the citizen against self-incriminating evidence. It is conceded and settled that a single unlawful act of sexual intercourse is not a criminal offense, but the question presented is, would the admission by the witness of a single act tend to criminate him? Our opinion is that it does, and that the witness ought not to be compelled to answer the question, for the reason that the admission may be the connecting link of a chain of evidence disclosing other facts and other circumstances leading to clear proof of a crime which would not have been known without the admission. The usual reply is that his admission cannot be used against him in any future prosecution, and that he is therefore protected. This fails to reach the mark, for although it cannot be used against the witness, it may be the means, the link by which other sufficient evidence has been discovered which could not have been done without the admission. No one knows what facts and secrets

*In re* BRIGGS.

are locked up in the bosom of a witness, and we think the true intent of the Constitution is that the witness shall not be compelled to disclose anything that may lead to criminal conduct without absolute protection against future prosecution."

Section 1354 of The Code provides that: "Nothing in this chapter, except as provided in the preceding section, shall render any person compellable to answer any question tending to criminate himself." Section 1353 has no bearing upon the question before us. Hence it follows that were it not for section 1215 of The Code the fourth question, and perhaps the second and third, would be incompetent under the laws as well as the Constitution of this State. Section 1215 is as follows: "No person shall be excused, on any prosecution, from testifying touching any unlawful gaming done by himself or others; but no discovery made by the witness upon such examination shall be used against him in any penal or criminal prosecution, and he shall be altogether pardoned of the offense so done or participated in by him."

The constitutionality of this section depends upon whether it gives to the witness the full measure of his constitutional protection. Its wording is not the best that might be selected to express its legal effect; but I think that it is sufficiently clear to justify our conclusion that it protects the witness from any prosecution or molestation of any kind on account of any offense concerning which he may be required to testify. Anything less than this would fail to give him adequate protection, and hence would fail to meet the constitutional requirement.

Whether the Legislature could grant pardons in analogy to the English Parliament is not before us; but there can be no doubt of its authority to pass acts of amnesty relating to certain classes of offenses. This power rests equally in reason and authority, its exercise being occasionally

demanded by dominating necessities of public policy. This is clearly recognized in the cases of *State v. Blalock,* 61 N. C., 242, and *State v. Keith,* 63 N. C., 140. The latter case, holding that an act of amnesty was not only valid, but created a vested right of immunity which could not be repealed even by a constitutional convention, was decided in 1869 by a court, all of whose members had been elected at the same election at which the Constitution itself was adopted, and one of whose Justices was a distinguished member of the convention which framed the Constitution. If the oft-cited principle of contemporaneous construction has any force, it is peculiarly applicable to that case, in which occurs the cele-brated sentence: "These great principles are inseparable from American government and follow the American flag." See also, *State v. Morgan,* 133 N. C., 743.

It has been repeatedly held that the Fifth Amendment to the Federal Constitution is a restriction only upon the power of the United States, and not upon that of the States; but its provisions in this respect are so nearly identical with those of our own Constitution that the decisions thereon may well be cited in analogy. The said amendment pro-vides that "No person shall be compelled in any criminal case to be a witness against himself." Its scope was stated by *Chief Justice Marshall* when presiding at the trial of Aaron Burr, as follows: "Many links," he says, "frequently compose that chain of testimony which is necessary to convict an individual of crime. It appears to the Court to be the true sense of the rule that no witness is compellable to furn-ish any one of them against himself. It is certainly not only a possible but a probable case that a witness, by dis-closing a single fact, may complete the testimony against himself and, to every effectual purpose, accuse himself as entirely as he would by stating every circumstance which would be required for his conviction. The fact of itself would be unavailing, but all other facts, without it, would be

insufficient. While that remains concealed in his own bosom he is safe; but draw it from thence and he is exposed to a prosecution. The rule which declares that no man is compellable to accuse himself would most obviously be infringed by compelling a witness to disclose a fact of this description."

The question as to how far Congress may deprive a witness of his constitutional privilege of refusing to testify, by protecting him from the consequence of his testimony, has been fully and elaborately discussed by the Supreme Court in several cases, and especially in *Boyd v. U. S.,* 116 U. S., 616; *Counselman v. Hitchcock,* 142 U. S., 547; and *Brown v. Walker,* 161 U. S., 591.

Section 860 of the Revised Statutes, taken from the Act of February 25, 1868 (15 Stat. U. S., 37, c. 13), was as follows: "No pleading of a party, nor any discovery or evidence obtained from a party or witness by means of a judicial proceeding in this or any foreign country, shall be given in evidence, or in any manner used against him or his property or estate, in any court of the United States, in any criminal proceeding, or for the enforcement of any penalty or forfeiture."

In Counselman's case the Court held that the witness could not be compelled to testify because the protection afforded by the statute was not equivalent to that of the Constitution. It says, on page 585: "We are clearly of opinion that no statute which leaves the party or witness subject to prosecution after he answers the criminating question put to him, can have the effect of supplanting the privilege conferred by the Constitution of the United States. Section 860 of the Revised Statutes does not supply a complete protection from all the perils against which the constitutional prohibition was designed to guard, and is not a full substitute for that prohibition. In view of the consti-

tutional provision, a statutory enactment, to be valid, must afford absolute immunity against future prosecution for the offense to which the question relates. In this respect we give our assent rather to the doctrine of Emery's case, in Massachusetts, than to that of *People v. Kelly,* in New York; and we consider that the ruling of this Court in *Boyd v. United States, supra,* supports the view we take. Section 860, moreover, affords no protection against that use of compelled testimony which consists in gaining therefrom a knowledge of the details of a crime, and of sources of information which may supply other means of convicting the witness or party."

In view of this decision, Congress passed the Act of February 11, 1893 (27 Stat. U. S., 443, c. 83). It was held in *Brown v. Walker,* 161 U. S., 591, that the act deprived the witness of his constitutional right to refuse to answer, inasmuch as it afforded absolute immunity against prosecution, Federal or State, for the offense to which the question related. It is interesting to note that this case was decided by a bare majority of the Court, *Justices Field, Shiras, Gray* and *White* dissenting on the ground of the absolute sanctity of the constitutional provision.

While I am deeply impressed with the force of the dissenting opinions in that case, I feel compelled to hold, on grounds of the highest public policy, that the witness may be required to testify where the statute affords him in fact as well as in theory absolute immunity from prosecution or molestation of any kind on account of all transactions referred to in his involuntary testimony.

At the same time I feel the full responsibility of holding that in any case constitutional provisions securing the rights and liberties of the citizen can be changed or modified by legislative enactment. I realize the danger pointed out by the Supreme Court of the United States in *Boyd v. U. S.*

(116 U. S., 616), where it says: "It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon. Their motto should be *obsta principiis.*"

The above opinion, written tentatively before the opinion of the Court assumed its present shape, is now filed as an expression of my individual views. Speaking for myself, it is perhaps proper to add that my views of the protection afforded by Article I, section 11, of the Constitution of this State are somewhat broader than those generally adopted by the courts, though held by some distinguished jurists.. I believe there is something dearer to the human heart than the mere money involved in a fine, something more terrible even than going to jail. To compel a man to reveal the innermost secrets of his life that would destroy his reputation, render him infamous in the eyes of his fellow-men, or tend to break up a happy home, might inflict suffering upon the innocent as well as the guilty equal to any punishment known to the law. Tears shed by a faithful wife over a dishonored bed are bitterer than those over an honored grave.

Among the great jurists who have expressed similar views, I will quote but one extract from the dissenting opinion of *Justice Field* in *Brown v. Walker,* 161 U. S., 591, where he

*In re* BRIGGS.

says, on page 631: "The amendment also protects him from all compulsory testimony which would expose him to infamy and disgrace, though the facts disclosed might not lead to a criminal prosecution. It is contended, indeed, that it was not the object of the constitutional safeguard to protect the witness against infamy and disgrace. It is urged that its sole purpose was to protect him against incriminating testimony with reference to the offense under prosecution. But I do not agree that such limited protection was all that was secured. As stated by counsel of the appellant, 'it is entirely possible, and certainly not impossible, that the framers of the Constitution reasoned that in bestowing upon witnesses in criminal cases the privilege of silence when in danger of self-incrimination, they would at the same time save him in all such cases from the shame and infamy of confessing disgraceful crimes and thus preserve to him some measure of self-respect.' * * * It is true, as counsel observes, that 'both the safeguard of the Constitution and the common law rule spring alike from that sentiment of personal respect, liberty, independence and dignity which has inhabited the breasts of English-speaking people for centuries, and to save which they have always been ready to sacrifice many governmental facilities and conveniences. In scarcely anything has that sentiment been more manifest than in the abhorrence felt at the legal compulsion upon witnesses to make confessions which must cover the witness with lasting shame and leave him degraded both in his own eyes and those of others. What can be more abhorrent * * * than to compel a man who has fought his way from obscurity to dignity and honor to reveal crimes of which he had repented and of which the world was in ignorance.' "

In the case at bar none of the questions tend to subject the witness to infamy or disgrace. However dangerous in its tendencies and demoralizing in its results, gaming is not gen-

erally regarded as disgraceful in this State. I do not intend
by this statement to justify gambling in the slightest degree,
but my duty to the defendant requires me to state facts as
they are, no matter how abhorrent to my personal sense of
moral obligation.

I must confess some hesitation in conceding that the doc-
trine of statutory substitution can ever apply to constitu-
tional guarantees, and I am induced to do so in this case only
upon controlling principles of public policy, and upon the
assurance that absolute immunity is guaranteed to the wit-
ness. It is significant that the case of *Brown v. Walker* was
decided by a bare majority of the Court, *Justices Field,
Shiras, Gray* and *White* dissenting in most vigorous terms,
on the ground that no statute requiring the witness to testify
could be, legally or in fact, the full equivalent of the constitu-
tional protection of absolute silence. *Justice Field* says, on
page 630 : "The constitutional amendment contemplates that
the witness shall be shielded from prosecution by reason of
any expressions forced from him whilst he was a witness in
a criminal case. It was intended that against such attempted
enforcement he might invoke, if desired, and obtain, the
shield of absolute silence. No different protection from that
afforded by the amendment can be substituted in place of it.
The force and extent of the constitutional guarantee are in
no respect to be weakened or modified, and the like considera-
tion may be urged with reference to all the clauses and pro-
visions of the Constitution designed for the peace and
security of the citizen in the enjoyment of rights or privi-
leges which the Constitution intended to grant and protect.
No phrases or words of any provision, securing such rights or
privileges to the citizen, in the Constitution are to be quali-
fied, limited or frittered away. All are to be construed lib-
erally that they may have the widest and most ample effect.
No compromise of phrases can be made by which one of

less sweeping character and less protective force in its influences can be substituted for any of them. The citizen cannot be denied the protection of absolute silence which he may invoke, not only with reference to the offense charged but with respect to any act of criminality which may be suggested."

*Justice Shiras,* with the concurrence of *Justices Gray* and *White,* says, on page 610: "It is too obvious to require argument that when the people of the United States, in the Fifth Amendment to the Constitution, declared that no person should be compelled in any criminal case to be a witness against himself, it was their intention not merely that every person should have such immunity, but that his right thereto should not be divested or impaired by any act of Congress."

Again the same Justices say, on page 621: "As already said, the very fact that the founders of our institutions, by making the immunity an express provision of the Constitution, disclosed an intention to protect it from legislative ,attack, creates a presumption against any act professing to dispense with the constitutional privilege."

Again they say, on page 627: "If, indeed, experience has shown, or shall show, that one or more of the provisions of the Constitution has become unsuited to affairs as they now exist, and unduly fettered the courts in the enforcement of useful laws, the remedy must be found in the right of the nation to amend the fundamental law, and not in appeals to the courts to substitute for a constitutional guaranty the doubtful and uncertain provisions of an experimental statute.

"It is certainly speaking within bounds to say that the effect of the provision in question as a protection to the witness is purely conjectural. No Court can foresee all the results and consequences that may follow from enforcing this law in any given case. It is quite certain that the witness is compelled to testify against himself. Can any Court be

*certain* that a sure and sufficient substitute for the constitutional immunity has been supplied by this act; and if there be room for reasonable doubt, is not the conclusion an obvious and necessary one?"

They conclude by saying, on page 628: "But surely no apology for the Constitution, as it exists, is called for. The task of the courts is performed if the Constitution is sustained in its entirety, in its letter and spirit.

I am deeply impressed with the meaning of those words, and whenever I give my assent to any statutory substitution it is only upon the condition that it gives to the witness an equal protection which *is always completely within his reach.*

WALKER, J., concurring. The correctness of the views expressed in the opinion of the Court, as written by the *Chief Justice,* has been demonstrated both by principle and authority. The question as to the respondent's right of appeal is not presented on this record. It appears to me, after careful consideration of the facts as they are shown in the transcript, that the case was brought here only for the purpose of having construed the statute (The Code, section 1215), which provides as follows: "No person shall be excused, on any prosecution, from testifying touching any unlawful gaming done by himself or others; but no discovery made by the witness upon such examination shall be used against him in any penal or criminal prosecution, and he shall be altogether pardoned of the offense so done or participated in by him." While the Judge finds that the witness was "contumacious" in refusing to answer, it is evident that he did not intend to use that word in the sense that the witness was actually disrespectful to the Court and refused obstinately and perversely, or without any reason, to answer the question after the law had been fully explained and made clear to him. There appears to have been some doubt enter-

tained in the Court below as to the true construction of the statute, and the formal finding of facts was made in order to obtain the opinion of this Court as to the law and to have a final and authoritative interpretation of section 1215 of The Code, so that there may be no doubt in the future as to whether or not a witness is fully protected in answering any question which would otherwise tend to criminate him. This conclusion is justified not only by the manner in which the finding is stated but by the fact that only a nominal fine, one dollar, was imposed upon the witness. In view of this state of the record it seems very clear that the question as to the witness' right of appeal from the Judge's order is not presented. In regard to contempts, it is provided by The Code, chapter 14, section 648 (6), that the contumacious and unlawful refusal of any person to answer any legal and proper interrogatory shall subject him to punishment "for contempt" and not "as for contempt," and the proceeding by which the facts are ascertained and the particulars of the offense specified and spread upon the record and the punishment is imposed "may be summary" when the alleged contempt is committed "in the immediate view and presence of the Court." By The Code, section 654 (4), it is provided that any person summoned as a witness and refusing to attend or to be sworn or to answer as such witness may be attached and punished "as for contempt." The different phraseology of the two sections upon the same subject-matter raises an important and interesting question as to the right of appeal. It will be observed that section 650 provides that the Court "may" punish summarily when the contempt is committed in its immediate view and presence, not that it "shall" do so, and when it does decide, under the circumstances of the particular case, that summary punishment shall be imposed, it is required to find the facts and "specify them on its record," but the requirement does not of itself give the right

*In re* BRIGGS.

to have the judgment of the Court reviewed by appeal or *certiorari*. *State v. Mott,* 49 N. C., 449. We are not now privileged to express an opinion as to how far, if at all, the principle of that case should control in this. Whether, if there is any method of review, it is by appeal, *certiorari* or *habeas corpus* is not, it seems to me, before us for decision, and when the question is properly presented the solution of it will be attended with some difficulty, as the language of the two sections of The Code to which reference has been made is not altogether free from ambiguity. As the question of the right of appeal is not therefore free from doubt, and is one fit for careful and serious consideration, it is well not to anticipate a decision of it by the slightest intimation as to the answer that it should receive. It is not only important but it is expressly required by the statute that the Court should "specify" the facts and particulars of the offense on the record, and then the reviewing tribunal, if the decision of the Court is reviewable, may for itself decide whether a contempt has been committed.

In this connection, the language of the Court in *Ex-parte Summers,* 27 N. C., 149, may be pertinent. Since that decision was made, the law has been amended so as to require the facts to be stated on the record. The Court in that case said: "It befits every Court which has a proper tenderness for the rights of the citizen and a due respect to its own character to state facts explicitly, not suppressing those on which the person might be entitled to be discharged more than it would insert others which did not exist, for the sake of justifying the commitment. A court which knows its duty, and is not conscious of violating it, will ever be desirous of putting upon the record or in its process the truth of the case, especially as thereby a higher court may be able to enlarge a citizen illegally committed or fined. But if the commitment or fine be in a general form for a contempt all other

courts are bound by it, and the party can only free himself by purging the contempt before the Court that has adjudged it." And again, referring to the appeal which the respondent had taken in that case, the Court says: "But in truth this is not, we think, the proper method of contesting the propriety or lawfulness of this order, if there be any such method. From the very nature of contempts, and in order that the punishment may be efficacious, the punishment must be immediate and peremptory, and not subject to suspension by appeal at the mere will of the offender, nor by any proceeding in the nature of an appeal. Suppose one to come into Court and abuse the Judge on the bench? Or suppose a sheriff with a writ in his hand in the presence of the Court positively refuses to return it, so that the party's action will be discontinued? What would sentences for these contempts be worth if the culprit could supersede them by appeal, *certiorari* or writ of error? Manifestly nothing; and the authority of the Court would really be contemptible if it could be thus eluded and prostrated. There is no instance therefore of the re-examination of an order committing or fining a person for a contempt, with the view of hearing the evidence and trying the question *de novo;* nor directly to reverse or quash an order of commitment or imposing a fine for an intrinsic insufficiency. If there be such insufficiency upon the face of the order the party has his remedy by *habeas corpus* and by action against those who act on the order either against his person or property."

The same may be said of Summer's case as was said of *State v. Mott, supra.* Whether its principle should apply to a state of facts such as is disclosed in this record must be left, for the present at least, as an open question for the reasons we have already given.

In the present case the facts are not fully stated and it is not shown what was the manner or demeanor of the wit-

ness, and this omission was proper, for it sufficiently appears that nothing more was put upon the record because it was the purpose to present the single question as to the meaning of section 1215 of The Code. A similar question was before this Court for its consideration in *La Fontaine v. Underwriters,* 83 N. C., 132, in which the Court construed section 488 (5) of The Code, the provision of that section in regard to exemption from prosecution being much less broad and comprehensive in affording protection to the witness than is the provision of section 1215. It is as follows: "But his (the witness') answer shall not be used as evidence against him in any criminal proceeding or prosecution." This was held in that case to be a sufficient exemption from criminal liability, and exposed the witness to punishment for contempt if he refused to answer any proper and legal question upon the ground that it would tend to convict him of a criminal offense. There was a full discussion in that case of the question whether the answer of the witness, while not tending directly to criminate him, might not furnish a "clue" which would lead to the discovery of evidence against him or supply one link in the chain, so that it would, in connection with other facts, have that tendency, or whether it would not disclose some fact which, though not in itself any evidence of guilt or even a circumstance tending to show guilt, might disclose other facts and circumstances which would form a complete chain and lead to his conviction. The Court reached the conclusion, after a consideration of this view of the matter, that the testimony of the witness cannot be used, directly or indirectly, either in the pending proceeding or in any other prosecution, and that if any evidence attempted to be used in any such proceeding against the witness can be traced to a statement made by him while on the stand as the cause which led to its discovery, the witness will be protected and can plead or otherwise avail himself of

*In re* BRIGGS.

the fact in bar of the prosecution.   We all agree, as I under-
stand, that the first three questions did not tend to criminate
the witness and he was bound to answer them.   The ground
taken by the respondent that those who participated in the
game, and whose names he would disclose if he answered
the questions, might in their turn give evidence against him,
has been held to be untenable, the doctrine being grounded
more on the fear of retaliation than on any sound principle
of law.     *Ward v. State,* 2 Mo., 120, 22 Am. Dec., 449;
*La Fontaine v. Underwriters, supra.*   The fourth question
tended to criminate the witness but he was fully protected
and "pardoned' by the statute, "and his constitutional right
therefore to give evidence against himself was maintained
intact."   *La Fontaine v. Underwriters, supra.*   The clause
of the Constitution (Article 3, section 6) which confers
power on the Governor to pardon persons convicted of crimi-
nal offenses does not seem to have been intended as an
exclusive grant of such power, and the Legislature may exer-
cise the right of pardon in the form in which it is author-
ized to do so by the statute under consideration.   This Court
has decided that the Legislature may grant amnesty (*State
v. Blalock,* 61 N. C., 242), which has been defined to be "a
sovereign act of pardon and forgetfulness for past acts of a
criminal nature."   Black's Law Dict., page 68.   It is at
least co-extensive in its meaning with the word "pardon,"
so far as its effect is concerned, because it effaces or wipes
out the offense which has been committed, "the difference
between the two being that a pardon is granted to one who
is certainly guilty, sometimes before but usually after con-
viction, and the Court takes no notice of it unless pleaded
or in some way claimed by the person pardoned; and it is
usually granted by the Crown or by the Executive; but
amnesty is extended to those who may be guilty and is usu-
ally granted by Parliament or the Legislature and to whole

classes before trial. Amnesty is an abolition or oblivion of
the offense; pardon is its forgiveness." *State v. Blalock,
supra.* In that case this Court virtually held that the Leg-
islature can pardon an offense, and it certainly must have
the power to do so when that power is exercised in further-
ance of the prosecution of crimes and of the detection and
punishment of criminals. As soon as the witness testifies in
a case which brings him within the protection of the stat-
ute he is at once pardoned of his own offense, the same as if
it had never been committed, and he is in no danger of being
prejudiced by any self-crimination.

Even when the witness is not protected by the statute, the
question which tends to criminate him is not for that rea-
son incompetent. The right to refuse to answer any such
question is a personal privilege of the witness, and if he
voluntarily relinquishes the privilege and chooses to answer,
no party to the suit can complain. *State v. Allen,* 107 N.
C., 905; *Boyer v. Teague,* 106 N. C., 576, 19 Am. St. Rep.,
547; *State v. Morgan,* 133 N. C., 743. It has also been
ruled to be a question of law for the Judge to decide whether
the testimony of the witness may criminate him. If in no
possible view it can have that tendency the Court decides
the question as one of law; but if it may subject him to
prosecution, depending upon the answer he gives to the
question, it has been said that the witness has the right to
decide whether it will or not. For example: when the
question calls simply for an affirmative or negative response
the witness must be the judge, for he only knows what the
answer will be, whether "yes" or "no," but it is manifestly
the duty of the Court to inform him as to his rights and his
privilege, and to instruct him as to how he may claim and
exercise the same. When, however, he is fully informed by
the Court that the law compels him to answer and that he
has no privilege, or that the question which is asked has

*In re* BRIGGS.

no possible tendency to criminate him, he must answer it or his refusal to do so will be at his peril, for the plain reason that the Court must decide that question as one of law and the witness must submit to that decision. If he persists in his refusal to answer, he may be summarily punished for his contumacy. 29 Am. & Eng. Ency. (1 Ed.), page 43; Code, section 648. And right here the question will arise whether he has the right to a review of the proceedings by appeal. Whether he has or not, it would be the duty of the Court in such a case to state fully in the record "the particulars of the offense" and then pronounce its judgment, so that the witness may avail himself of any remedy open to him for a review of the Court's decision by appeal or otherwise if the decision can be reviewed, or so that a revising tribunal may determine whether the judgment is warranted by the facts so specified in the record. When we have before us a record thus made up, we will be called upon to decide what is the procedure in such a case, if there is any, for reviewing or revising the judgment of the Court. The contempt committed in the case at bar, as shown in the record, is more technical than actual, and it is not incumbent upon us to do more under the circumstances than affirm the judgment, which, by the way, is all that is asked to be done by the Attorney-General in his well-considered brief.

The other questions are so fully and ably discussed in the opinion of the Court, delivered by the *Chief Justice,* that it is not necessary for any reference to be made to them in this opinion.